SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. James Comer** (A-42-20) (084509)
**State v. James C. Zarate** (A-43-20) (084516)

**Argued October 26, 2021 -- Decided January 10, 2022**

**RABNER, C.J., writing for the Court.**

Defendants James Comer and James Zarate ask the Court to find that a mandatory sentence of at least 30 years without parole, which the murder statute requires, is unconstitutional as applied to juveniles.

During the evening of April 17 and the early morning of April 18, 2000, Comer and two others participated in four armed robberies. During the second robbery, an accomplice shot and killed a robbery victim. At the time, Comer was 17 years old. Comer was sentenced in 2004 to an aggregate term of 75 years in prison with 68.25 years of parole ineligibility. In State v. Zuber, 227 N.J. 422, 451-53 (2017), the Court asked the trial court to conduct a new sentencing hearing in Comer's case and to consider the factors set forth in Miller v. Alabama, 567 U.S. 460, 478 (2012).

On remand, the trial court noted that factors were present, including the environment in which Comer grew up, which made "[t]he reality of criminal behavior . . . inescapable," and the fact that Comer had "shown an ability to be rehabilitated." The trial judge nevertheless imposed the mandatory minimum sentence for felony murder -- 30 years in prison without the possibility of parole. N.J.S.A. 2C:11-3(b)(1). The court declined to find the statute unconstitutional as applied to Comer and added that a 30-year period of parole ineligibility was "appropriate in this case." The Appellate Division upheld Comer's sentence, and the Court granted certification. 245 N.J. 484 (2021).

Defendant James Zarate was convicted of participating in a brutal murder with his older brother. At the time of the offense in 2005, Zarate was 14 years old, less than one month shy of his 15th birthday. For the murder conviction, the court sentenced Zarate to life imprisonment, subject to an 85-percent period of parole ineligibility under the No Early Release Act (NERA), with consecutive sentences for two additional offenses. The Appellate Division affirmed but remanded on a discrete issue, and it directed the trial court to address mitigating factor thirteen, N.J.S.A. 2C:44-1(b)(13) -- "The conduct of a youthful defendant was substantially influenced by another person more mature than the defendant" -- which the court did not consider earlier.

1

On remand, the court rejected mitigating factor thirteen, finding no proof that Zarate had been influenced by his older brother. The court addressed the Miller factors but found they did not favor Zarate, stressing his intelligence, supportive family, participation in his own defense, and prison infractions. The court resentenced Zarate to life in prison subject to NERA for murder but did not impose any consecutive sentences.

On a second appeal, the Appellate Division again reversed and remanded, instructing "the trial court to reconsider its proportionality analysis in light of" the United States Supreme Court's 2016 determination that Miller applies retroactively. The Court granted certification and summarily remanded for resentencing in light of Zuber.

After weighing other statutory factors, the court resentenced Zarate for murder to 50 years in prison. Consistent with NERA, Zarate must serve 85 percent of that term before he is eligible for parole. Zarate appealed, and the Appellate Division modified and affirmed his sentence. The Court granted part of Zarate's petition for certification. 245 N.J. 485 (2021).

**HELD:**      *The statutory framework for sentencing juveniles, if not addressed, will contravene Article I, Paragraph 12 of the State Constitution. To remedy the concerns defendants raise and save the statute from constitutional infirmity, the Court will permit juvenile offenders convicted under the law to petition for a review of their sentence after they have served two decades in prison. At that time, judges will assess a series of factors the United States Supreme Court has set forth in Miller v. Alabama, which are designed to consider the "mitigating qualities of youth." 567 U.S. 460, 476-78 (2012).

*At the hearing, the trial court will assess factors it could not evaluate fully decades before -- namely, whether the juvenile offender still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated. The court may also consider the juvenile offender's behavior in prison since the time of the offense, among other relevant evidence.

*After evaluating all the evidence, the trial court would have discretion to affirm or reduce the original base sentence within the statutory range, and to reduce the parole bar to no less than 20 years. A juvenile who played a central role in a heinous homicide and then had a history of problematic behavior in prison, and was found to be incorrigible at the time of the later hearing, would be an unlikely candidate for relief. On the other hand, a juvenile who originally acted in response to peer pressure and did not carry out a significant role in the homicide, and who presented proof at the hearing about how he had been rehabilitated and was now fit to reenter society after two decades, could be an appropriate candidate for a lesser sentence and a reduced parole bar.

*In remanding these matters for resentencing, the Court expresses no opinion on the outcome of either hearing.

2

1. Comer and Zarate both contend their sentences violate the prohibition against cruel and unusual punishment of the Eighth Amendment to the United States Constitution and Article I, Paragraph 12 of the State Constitution. The test under both Constitutions is generally the same: First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective? If the punishment fails under any one of the three inquiries, it is invalid. Although the test is similar under federal and state law, the State Constitution can confer greater protection than the Eighth Amendment affords. (pp. 24-26)

2. Since 2005, the United States Supreme Court has written extensively about juvenile sentencing. (pp. 26-32)

- In <u>Roper v. Simmons</u>, the Court banned capital punishment for juveniles under the Eighth Amendment, focusing on the "consistency of the direction of change" in states' approaches to sentencing juveniles to death, as well as on differences between adults and juveniles -- the "signature qualities of youth" -- which tell us that a juvenile's "irresponsible conduct is not as morally reprehensible as" the behavior of an adult. 543 U.S. 551, 564-73, 578 (2005).

- In <u>Graham v. Florida</u>, the Court barred sentences of life without parole for juveniles convicted of non-homicide offenses, again looking to "actual sentencing practices" and the "nature of juveniles." The Court concluded that none of the traditional goals of sentencing justified a sentence of life without parole, "an especially harsh punishment for a juvenile." 560 U.S. 48, 62-82 (2010).

- <u>Miller v. Alabama</u> extended the ban on life-without-parole sentences for juveniles to homicide offenses. The Court noted that the scientific evidence underlying its earlier rulings had "become even stronger" and that mandatory sentencing schemes "prevent the sentencer from taking" the circumstances of youth into account. The <u>Miller</u> Court listed five factors that should be considered before a juvenile is sentenced to life without parole. 567 U.S. 460, 465-80 (2012).

- The Court has since held that <u>Miller</u> applies retroactively and that, although a separate finding of permanent incorrigibility is not required before a judge can sentence a juvenile to life without parole, states could impose additional sentencing limits in cases in which juveniles are convicted of murder.

3. In <u>State v. Zuber</u>, the New Jersey Supreme Court extended <u>Miller</u> to sentences that are the practical equivalent of life without parole. 227 N.J. at 429, 446-47. The decision relied on the State Constitution and requires judges to evaluate the <u>Miller</u> factors before sentencing juveniles to a lengthy term of parole ineligibility. <u>Id.</u> at 429, 447. <u>Zuber</u> underscored one of <u>Graham</u>'s concerns: the inability to determine at the moment of sentencing whether a juvenile might one day be fit to reenter society. <u>Id.</u> at 451. The Court recognized that a claim by a juvenile sentenced to a substantial period of parole

3

ineligibility "would raise serious constitutional issues about whether sentences for crimes committed by juveniles, which carry substantial periods of parole ineligibility, must be reviewed at a later date." Id. at 452. The Court "encourage[d] the Legislature to examine [the] issue" "[t]o avoid a potential constitutional challenge." A number of bills relating to the issue have been introduced, but none of them have been enacted. (pp. 32-33)

4. Other states have addressed lengthy mandatory minimum sentences and parole bars for juvenile offenders. Fourteen jurisdictions have statutes that allow juvenile offenders to be considered for release before 30 years have passed. The Court reviews those statutes, ten of which have been enacted since Graham and Miller, as well as provisions adopted in several states that fix longer periods of parole ineligibility for juveniles for very serious offenses. Rulings by two State Supreme Courts ban mandatory minimum sentences for juvenile offenders. (pp. 34-40)

5. In the matters before the Court, both juveniles were sentenced under a statute that required them to serve a minimum of 30 years in prison with no possibility of parole, N.J.S.A. 2C:11-3(b)(1). The Court assesses that scheme under the three-part test to determine if the punishment violates the State Constitution. (p. 40)

- *Whether the punishment conforms with contemporary standards of decency.* Of particular concern here is whether a mandatory minimum period of 30 years in jail under N.J.S.A. 2C:11-3(b) -- with no discretion for a judge to assess the details of the offense or the circumstances of the juvenile -- reflects contemporary standards of decency. The Court discusses the broadly applicable principles derived from Supreme Court cases, which recognize the qualities particular to youth and thus require states to give juveniles a chance to show they are fit to reenter society. The Court also reviews legislative enactments in New Jersey that have set maximum sentencing limits in the Family Part at 20 years for murder and 10 years for felony murder; that have required that youth be considered as a mitigating factor at the time of sentencing; that have raised the minimum age for a juvenile to be waived to adult court; and that have eliminated life-without-parole sentences for juveniles. The Court notes the growing trend in other states to allow juveniles an opportunity for release before they spend three decades in jail, and it considers actual sentencing practices. Those sources and trends all suggest that a 30-year parole bar does not conform to contemporary standards of decency. (pp. 40-45)

- *Whether the punishment is grossly disproportionate to the offense.* Murder is an egregious offense that calls for serious punishment. But recent case law calls on judges to consider mitigating qualities of youth that reflect their diminished culpability. See Miller, 567 U.S. at 477; Zuber, 227 N.J. at 447. Yet neither a sentence of life without parole, as in Miller, nor a 30-year parole bar under the homicide statute leave room for any such analysis. Noting the example of felony murder, which the Legislature has distinguished from murder in the Family Part sentencing statute, the Court explains that the diminished culpability of juvenile

4

offenders suggests that the severity of a 30-year parole bar for juveniles, in many cases, may be grossly disproportionate to the underlying offense. (pp. 45-46)

- *Whether the punishment goes beyond what is needed to accomplish any legitimate penological objective.* Here too, because of the diminished culpability of juveniles, the traditional penological justifications -- retribution, deterrence, incapacitation, and rehabilitation -- "apply . . . with lesser force than to adults." Roper, 543 U.S. at 571. The Court analyzes in detail each of the four justifications in light of United States Supreme Court holdings and social science and finds that none are served by applying a 30-year mandatory minimum sentence to juveniles. (pp. 47-50)

6. Some juvenile offenders should receive and serve very lengthy sentences because of the nature of the offense and of the offender. By itself, that outcome does not necessarily trigger a constitutional concern provided appropriate limits and safeguards are followed. Instead, the constitutional concern here is twofold: the court's lack of discretion to assess a juvenile's individual circumstances and the details of the offense before imposing a decades-long sentence with no possibility of parole; and the court's inability to review the original sentence later, when relevant information that could not be foreseen might be presented. Against the backdrop of the United States Supreme Court's pronouncements on juvenile offenders and the Court's prior holding in Zuber, the existing statutory scheme runs afoul of Article I, Paragraph 12 of the New Jersey Constitution. To save the statute from infirmity, the Court holds under the State Constitution that juveniles may petition the court to review their sentence after 20 years. Although legislatures enact sentencing statutes, courts must determine whether laws are constitutional, and they can add procedures to statutes that would otherwise be unconstitutional to save them from infirmity. The Court imposes a look-back provision here to preserve the homicide statute because it has no doubt the Legislature would want the law to survive. (pp. 50-53)

7. Juvenile offenders sentenced under the statute may petition for a review of their sentence after having spent 20 years in jail. At the hearing on the petition, judges are to consider the Miller factors -- including factors that could not be fully considered decades earlier, like whether the defendant still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated. A defendant's behavior in prison since the time of the offense would shed light on those questions. Other factors, like the circumstances of the homicide offense, would likely remain unchanged. Both parties may also present additional evidence relevant to sentencing. In particular, the trial court should consider evidence of any rehabilitative efforts since the time a defendant was last sentenced. After evaluating all the evidence, the trial court would have discretion to affirm or reduce a defendant's original base sentence within the statutory range, and to reduce the parole bar below the statutory limit to no less than 20 years. The Court asks trial courts to explain and make a thorough record of their findings to ensure fairness and facilitate review. The Court explains that a number of sources support a 20-year look-back, but that the Legislature has the authority to select a shorter time frame. (pp. 53-56)

8.  Defendant Comer is entitled to be resentenced again because he was sentenced in keeping with the homicide statute's mandatory period of imprisonment.  After assessing the relevant evidence, the trial court here has the authority to impose a period of parole ineligibility of less than 30 years, but not less than 20 years.  The Court recognizes that the trial court weighed the Miller factors and reduced Comer's sentence substantially in 2018; the Court does not express a view on the outcome of the new hearing.  (pp. 57-58)

9.  Zarate is also entitled to be sentenced anew with an appropriate application of the Miller factors.  The first Miller factor invites consideration of the "hallmark features" of youth -- "among them, immaturity, impetuosity, and failure to appreciate risks and consequences."  Miller, 567 U.S. at 477.  At Zarate's most recent resentencing, the trial court mistakenly substituted "intelligence" for "maturity" in evaluating the factor; in addition, strategic decisions by counsel cannot be attributed to a juvenile or factor into the Miller analysis, absent evidence that the juvenile controlled counsel's choice.  Nor should a client's request that counsel file certain motions or make certain objections carry much, if any, weight, even if that privileged information comes to light.  The Court finds no error in the trial court's rejection of Zarate's claim that he was a victim of peer pressure.  And the judge appropriately considered the serious nature of the offense as well as Zarate's behavior in prison and record of infractions, among other things.  The Court does not express a view on the outcome of the resentencing hearing.  (pp. 58-61)

**Both matters are REVERSED and REMANDED for resentencing.**

**JUSTICE SOLOMON, concurring in part and dissenting in part,** joins the majority's conclusions in Zarate's case that the sentencing court misapplied the first Miller factor and appropriately rejected the peer-pressure argument.  Justice Solomon dissents, finding that the majority's imposition of a 20-year look-back period is not permitted by the Constitution -- which confers such authority upon the Legislature -- and is not required to save the homicide statute from constitutional infirmity.  Justice Solomon expresses belief that New Jersey's current sentencing scheme fulfils the constitutional mandate set forth in the cases on which the majority relies -- that courts are required to treat juveniles differently and to consider certain factors before sentencing them to life without parole or its functional equivalent.  Thus, Justice Solomon states, it is not the Court's prerogative to impose an additional restriction on juvenile sentencing.  In Justice Solomon's view, a 30-year parole bar for juveniles tried as adults and convicted of homicide conforms with contemporary standards of decency, is not grossly disproportionate as to homicide offenses, and does not go beyond what is necessary to achieve legitimate penological objectives.  Viewing the imposition of a look-back period as a subjective policy decision, Justice Solomon writes that the decision must be left to the Legislature.

**JUSTICES LaVECCHIA, ALBIN, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.  JUSTICE SOLOMON filed an opinion concurring in part and dissenting in part, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.**

SUPREME COURT OF NEW JERSEY

A-42 September Term 2020

A-43 September Term 2020

084509 and 084516

State of New Jersey,

Plaintiff-Respondent,

v.

James Comer, a/k/a
James B. Comer and
James F. Comer

Defendant-Appellant.

State of New Jersey,

Plaintiff-Respondent,

v.

James C. Zarate, a/k/a
Navajas Zarate,

Defendant-Appellant.

State v. James Comer (A-42-20):
On certification to the Superior Court,
Appellate Division.

State v. James C. Zarate (A-43-20):
On certification to the Superior Court,
Appellate Division.

1

Argued
October 26, 2021

Decided
January 10, 2022

Lawrence S. Lustberg argued the cause for appellant in State v. Comer (A-42-20) (Gibbons, American Civil Liberties Union of New Jersey Foundation, and Lone Star Justice Alliance, attorneys; Lawrence S. Lustberg, Alexander Shalom, Jeanne LoCicero, and Avram D. Frey, on the briefs).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent in State v. Comer (A-42-20) (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the briefs).

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant in State v. Zarate (A-43-20) (Joseph E. Krakora, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

John McNamara, Jr., Chief Assistant Prosecutor, argued the cause for respondent in State v. Zarate (A-43-20) (Robert J. Carroll, Morris County Prosecutor, attorney; John McNamara, Jr. and Jessica Marshall, Assistant Prosecutor, on the briefs).

Joseph J. Russo, Deputy Public Defender, argued the cause for amicus curiae Public Defender of New Jersey in State v. Comer (A-42-20) (Joseph E. Krakora, Public Defender, attorney; Alicia J. Hubbard, of counsel and on the brief).

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in State v. Comer (A-42-20) (Andrew J. Bruck, Acting Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the brief, and Lauren Bonfiglio, Deputy Attorney General, on the brief).

2

Dillon J. McGuire argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. Comer (A-42-20) (Pashman Stein Walder Hayden, attorneys; CJ Griffin, of counsel and on the brief, and Dillon J. McGuire, on the brief).

Natalie J. Kraner argued the cause for amici curiae Campaign for the Fair Sentencing of Youth, Incarcerated Children's Advocacy Network, New Jersey Parents' Caucus, Transformative Justice Initiative, The Beyond the Blindfold of Justice Project, Formerly Incarcerated Youth, and New Jersey Incarcerated Youth in State v. Comer (A-42-20), and State v. Zarate (A-43-20) (Lowenstein Sandler, and The Rutgers Criminal and Youth Justice Clinic, attorneys; Natalie J. Kraner, Anthony J. Cocuzza, Stephanie Ashley, Laura Cohen, Elana Wilf, and Tyler Dougherty, on the brief).

Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in State v. Zarate (A-43-20) (Andrew J. Bruck, Acting Attorney General, attorney; Carol M. Henderson, of counsel and on the brief, and Jennifer E. Kmieciak and Lauren Bonfiglio, Deputy Attorneys General, on the brief).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey in State v. Zarate (A-43-20) (Gibbons, American Civil Liberties Union of New Jersey Foundation, and Lone Star Justice Alliance, attorneys; Lawrence S. Lustberg, Alexander Shalom, Jeanne LoCicero, and Avram D. Frey, on the brief).

Rachel E. Simon argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. Zarate (A-43-20) (Pashman Stein Walder Hayden, attorneys; Aidan P. O'Connor, of counsel and on the brief, and Darcy Baboulis-Gyscek, on the brief).

This appeal raises challenging questions about the constitutional limits that apply to sentences for juvenile offenders.

The law recognizes what we all know from life experience -- that children are different from adults.  Children lack maturity, can be impetuous, are more susceptible to pressure from others, and often fail to appreciate the long-term consequences of their actions.  Miller v. Alabama, 567 U.S. 460, 477 (2012).  They are also more capable of change than adults.  Graham v. Florida, 560 U.S. 48, 68 (2010).  Yet we know as well that some juveniles -- who commit very serious crimes and show no signs of maturity or rehabilitation over time -- should serve lengthy periods of incarceration.

The issue before the Court is how to meld those truths in a way that conforms to the Constitution and contemporary standards of decency.  In other words, how to impose lengthy sentences on juveniles that are not only just but that also account for a simple reality:  we cannot predict, at a juvenile's young age, whether a person can be rehabilitated and when an individual might be fit to reenter society.

The question arises in the context of two juveniles who committed extraordinarily serious crimes for which they received long sentences.  In one

case, the juvenile offender, who was convicted of felony murder, will not be released for three decades and cannot be considered for parole throughout that time. In the other appeal, it will be more than four decades before the 14-year-old offender, convicted of purposeful murder, will first be eligible to be considered for parole.

Both juveniles argue that their sentences violate federal and state constitutional provisions that bar cruel and unusual punishment. See U.S. Const. amend. VIII; N.J. Const. art. I, ¶ 12. They ask the Court to find that a mandatory sentence of at least 30 years without parole, which N.J.S.A. 2C:11-3(b)(1) requires, is unconstitutional as applied to juveniles.

We decline to strike that aspect of the homicide statute. But we recognize the serious constitutional issue defendants present under the State Constitution. The Court, in fact, anticipated the question in 2017 and asked the Legislature to consider amending the law to allow juvenile offenders who receive sentences with lengthy periods of parole ineligibility to return to court years later and have their sentences reviewed. State v. Zuber, 227 N.J. 422, 451-53 (2017).

Today, faced with actual challenges that cannot be overlooked, we are obligated to address the constitutional issue the parties present and cannot wait to see whether the Legislature will act, as the State requests. That approach is

5

consistent with the basic roles of the different branches of government. The Legislature has the responsibility to pass laws that fix the range of punishment for an offense; the Judiciary is responsible to determine whether those statutes are constitutional. Under settled case law, courts also have the authority to act to protect statutes from being invalidated on constitutional grounds.

Here, the statutory framework for sentencing juveniles, if not addressed, will contravene Article I, Paragraph 12 of the State Constitution. To remedy the concerns defendants raise and save the statute from constitutional infirmity, we will permit juvenile offenders convicted under the law to petition for a review of their sentence after they have served two decades in prison. At that time, judges will assess a series of factors the United States Supreme Court has set forth in Miller v. Alabama, which are designed to consider the "mitigating qualities of youth." 567 U.S. at 476-78 (quoting Johnson v. Texas, 509 U.S. 350, 367 (1993)).

We provide for the hearing, rather than strike the homicide statute on constitutional grounds, because we have no doubt the Legislature would want the law to survive. The timing of the hearing is informed by a number of sources, including acts by the Legislature and other officials.

At the hearing, the trial court will assess factors it could not evaluate fully decades before -- namely, whether the juvenile offender still fails to

6

appreciate risks and consequences, and whether he has matured or been rehabilitated. The court may also consider the juvenile offender's behavior in prison since the time of the offense, among other relevant evidence.

After evaluating all the evidence, the trial court would have discretion to affirm or reduce the original base sentence within the statutory range, and to reduce the parole bar to no less than 20 years. A juvenile who played a central role in a heinous homicide and then had a history of problematic behavior in prison, and was found to be incorrigible at the time of the later hearing, would be an unlikely candidate for relief. On the other hand, a juvenile who originally acted in response to peer pressure and did not carry out a significant role in the homicide, and who presented proof at the hearing about how he had been rehabilitated and was now fit to reenter society after two decades, could be an appropriate candidate for a lesser sentence and a reduced parole bar.

The Appellate Division rejected the juveniles' constitutional claims. We therefore reverse and remand both matters for resentencing. We express no opinion on the outcome of either hearing.

I.

We discussed the facts underlying defendant James Comer's convictions in a prior opinion. See Zuber, 227 N.J. at 433-34. We briefly refer to the facts again here.

7

During the evening of April 17 and the early morning of April 18, 2000, Comer and two others participated in four armed robberies. During the second robbery, an accomplice shot and killed a robbery victim. At the time, Comer was 17 years old.

Comer was prosecuted as an adult, and a jury convicted him of felony murder, armed robbery, conspiracy to commit robbery, weapons offenses, and theft. The trial judge originally sentenced Comer in 2004 to an aggregate term of 75 years in prison with 68 years and 3 months of parole ineligibility. The sentence included a term of 30 years' imprisonment with 30 years of parole ineligibility for first-degree felony murder, contrary to N.J.S.A. 2C:11-3(a)(3). The court imposed three consecutive terms of 15 years' imprisonment as well. Comer would not have been eligible for parole until 2068, when he would be 85 years old.

In 2013, Comer filed a motion to correct an illegal sentence. To challenge the constitutionality of his sentence, he relied on recent decisions of the United States Supreme Court such as Graham, 560 U.S. at 82 (banning life without parole for juveniles convicted of non-homicide offenses), and Miller, 567 U.S. at 479-80 (requiring judges to consider qualities associated with youth before sentencing a juvenile to life without parole in homicide cases).

The trial court granted Comer's motion and found he was entitled to be resentenced under the procedures outlined in Miller.

On direct certification, we affirmed the trial court's judgment. In doing so, we extended Miller's reasoning "to sentences that are the practical equivalent of life without parole." Zuber, 227 N.J. at 429. We therefore asked the trial court to conduct a new sentencing hearing and consider factors such as Comer's "immaturity, impetuosity, and failure to appreciate risks and consequences; family and home environment; family and peer pressures; inability to deal with police officers or prosecutors or his own attorney; and the possibility of rehabilitation." Id. at 453 (internal quotation marks omitted) (quoting Miller, 567 U.S. at 478) ("the Miller factors").

The trial court applied and weighed those factors on remand.[1] It found

> that [Comer] grew up in an environment that forced his criminal behavior. [His] parents and extended family had criminal histories and involvement with drugs. The reality of criminal behavior as a way of life was . . . inescapable for [him]. And [he] has shown an ability to be rehabilitated and has been incident free for four years while incarcerated. . . . As a juvenile, [he] may not have been as able to appreciate the criminality of

---

[1] Among other things, the court heard testimony from an expert psychiatrist who evaluated Comer and prepared a detailed report. The report described defendant's repeated exposure to traumatic events as a child. Because of the sensitive nature of the confidential report, as well as the basis for our ruling, we do not discuss the report or the testimony in detail. Other evidence at the hearing addressed Comer's efforts at rehabilitation and growth.

9

his behavior and the impact it would have on others, especially [the victim] and his family.

The trial judge nevertheless imposed the mandatory minimum sentence for felony murder -- 30 years in prison without the possibility of parole. N.J.S.A. 2C:11-3(b)(1). The court declined to find the statute unconstitutional as applied to Comer. The judge also observed that

> [w]hile it is unknown to what degree you will be, or need to be, deterred, it's clear that society abhors the taking of life and our citizens must know that [if] they do so, or participate in a criminal act that results in death, they are subject to a minimum of 30 years in prison.

The court added that a 30-year period of parole ineligibility was "appropriate in this case" and that it did not need to reach the constitutional issue. In light of the Miller factors and State v. Yarbough, 100 N.J. 627 (1985), the court did not impose consecutive sentences on the remaining counts of conviction.

Comer appealed and again argued that a mandatory minimum sentence of 30 years without parole is unconstitutional as applied to juveniles. The Appellate Division rejected the claim. The court relied heavily on a prior appellate ruling in State v. Pratt, 226 N.J. Super. 307 (App. Div. 1988), which upheld a similar sentence imposed on a juvenile offender against a constitutional challenge. In its discussion about whether a 30-year sentence without parole constituted cruel and unusual punishment, the court in Pratt

10

noted "that public concern about unrehabilitated, violent youthful offenders has 'stimulated a "just deserts" approach to juvenile crime.'" Id. at 326 (quoting State v. R.G.D., 108 N.J. 1, 8 (1987)). Pratt also recognized that murder is "the most heinous and vile offense proscribed by our criminal laws," and accordingly found that the mandatory punishment did not violate constitutional principles. Id. at 326-27 (quoting State v. Serrone, 95 N.J. 23, 27 (1983)).

The Appellate Division here found that "Pratt is directly on point and remains good law." Because Miller and Zuber "addressed life sentences and their equivalents," the court concluded that neither case "require[d] reversal of Pratt." The court also distinguished State in Interest of C.K., 233 N.J. 44 (2018), which we discuss further below.

In upholding Comer's sentence, the Appellate Division acknowledged the complexity of the issue before it and added it was not "appropriate for this intermediate appellate court to discard longstanding precedent."

We granted Comer's petition for certification. 245 N.J. 484 (2021). We also granted leave to appear as amici curiae to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and to the Campaign for the Fair Sentencing of Youth, joined by six other organizations. The Attorney General

11

and the Public Defender appeared before the Appellate Division and continued to participate in this appeal.  See R. 1:13-9(d).

## II.

Defendant James Zarate was convicted of participating in a brutal murder with his then-18-year-old brother, Jonathan.[2]  At the time of the offense in 2005, Zarate was 14 years old, less than one month shy of his fifteenth birthday.

We briefly recount the disturbing facts of the crime.  Zarate lived with his father and stepmother in 2003, next door to J.P. and her family.  According to J.P.'s mother, Zarate and J.P. were in some of the same classes at school, and "he picked on her a lot."  J.P.'s mother eventually asked the school to separate the children.  She also spoke directly with Zarate and told him to leave J.P. alone.  The next day, a brick was thrown through the rear window of her car.  J.P.'s mother contacted the police and signed a harassment complaint against Zarate.  After the incident, Zarate had to move to another town and live with his mother.  The charges were ultimately dismissed.

Two years later, on Saturday, July 30, 2005, J.P.'s parents reported that she was missing to the police.  At around 3:00 a.m. on Sunday, a police officer

---

[2]  To avoid confusion, we refer to the defendant as "Zarate" and his brother as "Jonathan."

12

driving across the Union Avenue Bridge, which spans the Passaic River, spotted a jeep parked on the shoulder of the bridge. The officer saw Zarate and V.B., a friend of Zarate's, attempt to throw a footlocker over the bridge's railing, while Jonathan stood nearby. The footlocker contained J.P.'s body without the lower parts of her legs; her bludgeoned body had multiple stab and knife wounds. Her legs, as well as blood-stained paper towels and some clothing, were found in two garbage bags in the jeep.

The grand jury charged Zarate with first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); two counts of third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); two counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); two counts of second-degree disturbing or desecrating human remains, N.J.S.A. 2C:22-1(a)(1); and two counts of third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1). The court granted the State's motion to prosecute Zarate as an adult.

Zarate was tried separately from his brother.[3] At trial, the State introduced Zarate's statement to the police shortly after his arrest. In the statement, Zarate said his only role in the crime was to help his older brother dispose of J.P.'s body. Zarate claimed that Jonathan invited J.P. to their house

---

[3] During Zarate's trial, the court instructed the jury about a stipulation relating to Jonathan. The parties stipulated that he "stood trial alone previously" and had been "convicted by a jury of murder and other crimes."

13

on the night of the murder. According to Zarate, Jonathan told him after the fact that he beat, stabbed, and killed J.P.; he then cut off her lower legs because her entire body would not fit into the trunk. At Jonathan's request, Zarate helped his brother put the trunk inside their father's jeep. Together, they then drove to pick up V.B. on the way to the bridge so that he could help them throw the trunk into the river.

V.B. cooperated with the State and testified at trial that Zarate and Jonathan told him they both killed J.P. V.B. told the jury that Zarate admitted punching and stabbing J.P. and said that Jonathan choked and punched her. V.B. gave conflicting statements, which the jury heard, before he agreed to cooperate.

A medical examiner who performed an autopsy also testified. Based on the nature of the injuries he observed, he concluded that at least two people attacked the victim. He explained that different wounds to the front and back of J.P.'s body occurred simultaneously before a final, fatal blow to her stomach. The medical examiner also concluded that J.P. was alive when an attempt was made to amputate her right leg.

The jury found Zarate guilty of all counts. He has been sentenced three different times since then.

14

Zarate was first sentenced on July 31, 2009, ten days before he turned nineteen. During the hearing, he spoke on his own behalf and explained how he looked up to his older brother. After their parents divorced, he considered Jonathan "like a father figure, a parent figure." "[I]f he asked me to do something, I wouldn't even think about it twice. I'd just go ahead and do it," Zarate explained.

Zarate also described how difficult it had been to be incarcerated at an adult facility instead of a juvenile detention center. In his words, "[f]rom 15 to 18, . . . two years and two months, I was locked down for no reason, except for being underage. But there's a quote by a German philosopher, Frederick Nietzsche, that what doesn't kill me, only makes me stronger."

During his allocution, Zarate noted that he "wanted to prepare the best defense [he] could." He stated that he and his family "requested" that his "lawyer . . . file certain motions before trial, but I was always denied. Every time I asked that he object to something, sometimes he would ignore me."

Zarate addressed the victim's family as well. "I would like to apologize for the part of the crime that I did, but I'm innocent of murder. . . . If I could change what I did, I would have. I was a little kid, though, influenced by my brother."

For the murder conviction, the trial court sentenced Zarate to life imprisonment, subject to an 85-percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court also imposed a consecutive term of 4 years' imprisonment for a weapons offense, and a second consecutive term of 9 years for desecrating human remains.

Before imposing sentence, the court considered a psychiatric report Zarate submitted from Dr. Weinapple, and a communication from Zarate's aunt, Dr. Raul, also a psychiatrist. The court noted that the materials referred to the "brain development of young teens." "But," the court observed, "there was no testing that was provided to me showing that there was any lack of brain development." Based on Zarate's educational records -- including a number of items since the offense -- and his organized presentation in court, the trial judge found that Zarate was "bright."

The judge did not directly address mitigating factor thirteen during the hearing. See N.J.S.A. 2C:44-1(b)(13) ("The conduct of a youthful defendant was substantially influenced by another person more mature than the defendant . . . ."). 

The Appellate Division affirmed Zarate's conviction but remanded for resentencing on a merger issue. It also directed the trial court to address mitigating factor thirteen.

16

Zarate was resentenced by the same judge on January 17, 2014. The court rejected mitigating factor thirteen and found no proof that Jonathan influenced Zarate. "To the contrary," the judge observed, "he is the one who influenced others." The court cited V.B.'s testimony and noted that only Zarate had a motive to harm J.P. The judge also found Zarate's statements -- that he was asleep on a couch during the murder, and that J.P.'s body was in the footlocker when Jonathan asked for his help -- incredible.

The court again observed that Zarate was a "bright and intelligent individual." The judge pointed to Zarate's educational records since the offense, his "well-organized and intelligent allocution" in 2009 when he quoted Nietzsche, and his requests that his attorney file motions and make objections.

The court also quoted extensively from Dr. Raul's and Dr. Weinapple's submissions and their general comments on brain development. The court noted there was no evidence that Zarate had a psychotic disorder and no neuropsychological testing specific to him. The court referred to another psychiatric report prepared closer in time to the murder, which Dr. Weinapple summarized, that found no specific psychiatric illness.

The trial judge also addressed the Miller factors. Among other points, the court noted that Zarate had a "loving, caring, close-knit family" and that

17

his sentence was not the equivalent of life without parole. The court added that it had already considered many of the Miller factors, including the circumstances of the offense and Zarate's participation in it.

The trial court resentenced Zarate for murder to life in prison subject to NERA's 85-percent period of parole eligibility. The court did not impose any consecutive sentences. It merged one of the prior consecutive counts with the murder conviction and ran the second count concurrently because of Zarate's recent conduct in prison.

The Appellate Division again reversed and remanded. It instructed "the trial court to reconsider its proportionality analysis in light of the United States Supreme Court's recent opinion in Montgomery v. Louisiana," 577 U.S. 190 (2016). The Appellate Division observed that the 63.75-year parole disqualifier under NERA meant Zarate would not be eligible to be considered for parole until the age of 78.

We granted Zarate's petition for certification and the State's cross-petition and summarily remanded for resentencing in light of our 2017 ruling in Zuber. 229 N.J. 167 (2017); 229 N.J. 140 (2017).

Zarate was resentenced again on November 8, 2017, by the judge who oversaw his trial and two prior sentencing hearings. At the outset, the trial court thoroughly reviewed Zuber as well as relevant recent Supreme Court

case law. In doing so, the court made clear that "permanent incorrigibility is not my finding." Because of Zarate's "potential capacity . . . to reform as an adult," the court explained it had eliminated a consecutive sentence at the last hearing. Yet the court also observed that Zarate had committed seven disciplinary infractions while in jail, including an assault on a corrections officer, and had failed to complete a number of courses he started, including one on anger management.

The court then considered the <u>Miller</u> factors in greater detail and partly recounted certain findings from the earlier hearings. As to the first factor -- the hallmark features of youth, such as immaturity -- the trial court again noted that Zarate was "bright" and "intelligent," which made the factor "less forceful." The judge referred to Zarate's grades, SAT scores, GED, and paralegal coursework since the offense, as well as his "well-organized and intelligent allocution."

The court also reviewed the psychiatric reports and letters and made observations similar to its previous findings. In short, the trial court noted "[t]here was nothing specific, by way of testing or otherwise, that was provided about the defendant's lack of brain development that impacted his participation in these events."

For the second factor -- family and home environment -- the court noted that Zarate's home environment was neither dysfunctional nor brutal. The court found Zarate came from a caring, close-knit, supportive, religious family environment.

For the third factor -- the circumstances of the offense, extent of the defendant's participation, and familial and peer pressures -- the court found that Zarate "participated extensively" in a "brutal, merciless slaying and dismembering." The court saw "little or no pressure from anyone for him to do [what] he did."

As to the fourth factor -- the incompetencies of youth, such as an inability to deal with police officers, prosecutors, or an attorney -- the court found Zarate had shown he had no such difficulties. The court noted that he had persisted with his initial story to the police that he played no role in the murder, and that he had assisted his attorney, "telling [him] what to do" at trial. The court commented that a stipulation about Jonathan was "cunning," adding that Zarate managed to get his statement to the police in evidence without being cross-examined.

Finally, as to the fifth factor -- the possibility of rehabilitation -- the court acknowledged that Zarate had taken steps towards rehabilitation but found they were offset to some extent by his prison infractions. In addition,

20

the court observed that Zarate still denied he had participated in the murder despite overwhelming proof to the contrary. The court found that Zarate showed no remorse for his actual role in the offense.

After weighing other statutory factors, the court resentenced Zarate for murder to 50 years in prison. Consistent with NERA, Zarate must serve 85 percent of that term before he is eligible for parole. The court either merged or imposed concurrent sentences on the other counts of conviction. According to the State, Zarate will be 56 years old when he is first eligible for parole. In a separate order, the court denied Zarate's motion to bar a term of imprisonment in excess of 30 years as cruel and unusual punishment.

Zarate appealed, and the Appellate Division modified and affirmed his sentence. We consider only those parts of the court's ruling that relate to the limited grant of certification.

The Appellate Division assumed, without deciding, that Zarate's sentence was the functional equivalent of life without parole and that the Miller factors therefore applied. The court nevertheless was not persuaded that the trial judge misapplied the factors. The appellate court deferred to the trial judge's interpretation of the psychological reports and trial evidence. As to the length of the sentence, the court acknowledged it is difficult to predict whether Zarate "will ever gain the capacity for rehabilitation." Consistent

with <u>Zuber</u>, the Appellate Division declined to foreclose the possibility that Zarate might one day be able to return to court to show "that he has sufficiently reformed himself to a degree that" his sentence is "no longer . . . constitutional under the Eighth Amendment."

We granted part of Zarate's petition for certification.[4]  245 N.J. 485 (2021).  We also granted amicus status to the ACDL and to the Campaign for the Fair Sentencing of Youth, joined by six other organizations.  The Attorney General and the ACLU appeared before the Appellate Division and continued to participate in this appeal.  <u>See</u> <u>R.</u> 1:13-9(d).

### III.

The parties and amici in both appeals present certain overlapping arguments.  Comer and Zarate contend that a mandatory sentence of at least 30 years without parole, which N.J.S.A. 2C:11-3(b)(1) requires, is unconstitutional as applied to juveniles.  Along with the ACLU and the ACDL, defendants argue the law constitutes cruel and unusual punishment within the meaning of the Federal and State Constitutions.  Among other arguments, they stress the law divests sentencing judges of discretion to apply mitigating factors that apply to youth and does not adequately reflect a juvenile's

---

[4]  Zarate's claim that he should have been resentenced before the Family Part -- because of a statutory change in 2015 that raised the minimum age for waiver to 15 -- is not part of this appeal.  245 N.J. 485 (2021).

22

diminished moral culpability. They also maintain the Court must resolve the fundamental constitutional question presented.

Zarate additionally argues it is unconstitutional to sentence a juvenile to the functional equivalent of life without parole after finding the person is not permanently incorrigible. He also contends the trial court's analysis of the Miller factors in his case was flawed.

The ACLU argues in support of Zarate that, under the State Constitution, juveniles sentenced to lengthy periods of parole ineligibility must be afforded an opportunity to review their sentences after no more than 15 years. The organization relies on social science research that they submit shows juveniles "age out of crime within 15 years."

The State and the Attorney General advance the opposite position and maintain the homicide statute is constitutional as applied to juveniles who are waived to adult court. The law's mandatory minimum features, they submit, do not amount to cruel and unusual punishment under either the Federal or State Constitutions. They also contend the Court should defer to the Legislature, which is considering whether and when defendants might apply to be resentenced.

The Attorney General in Zarate's case submits that the Court should rely on its supervisory authority to direct sentencing judges to consider the Miller

23

factors when they assess whether to impose a sentence of more than 30 years without parole.

The Campaign for the Fair Sentencing of Youth agrees with defendants' constitutional arguments. The group also presents the stories of ten juvenile offenders, each convicted of homicide, to show the capacity juveniles have to reform and contribute to society.

IV.

Comer and Zarate both contend their sentences violate the Eighth Amendment to the United States Constitution and Article I, Paragraph 12 of the State Constitution.

The Eighth Amendment provides that "[e]xcessive bail shall not be required . . . nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Amendment and its protections apply to the States through the Fourteenth Amendment. Roper v. Simmons, 543 U.S. 551, 560 (2005); Robinson v. California, 370 U.S. 660, 666 (1962).

The Eighth Amendment's prohibition against cruel and unusual punishment "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" Roper, 543 U.S. at 560 (alteration in original) (quoting Atkins v. Virginia, 536 U.S. 304, 311 (2002)). "Courts interpret the Eighth Amendment 'according to its text, by

24

considering history, tradition, and precedent . . . .'" Zuber, 227 N.J. at 438 (quoting Roper, 543 U.S. at 560). The interpretive process "often requires 'refer[ence] to the evolving standards of decency that mark the progress of a maturing society.'" Ibid. (alteration in original) (quoting Roper, 543 U.S. at 561).

Article I, Paragraph 12 of the New Jersey Constitution also bars cruel and unusual punishment. To determine whether a punishment is cruel and unusual, it is appropriate to conduct an independent analysis under the State Constitution. State v. Ramseur, 106 N.J. 123, 182 (1987). The test under both Constitutions is "generally the same": "First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?" Zuber, 227 N.J. at 438 (quoting Ramseur, 106 N.J. at 169). If the punishment fails under any one of the three inquiries, "it is invalid." State v. Gerald, 113 N.J. 40, 78 (1988).

To assess the first prong, courts consider legislation enacted in their home state and other states, among other sources. Roper, 543 U.S. at 564-68. As to the second prong, courts weigh "the culpability of the offenders . . . in light of their crimes and characteristics, along with the severity of the

punishment in question." Graham, 560 U.S. at 67 (citing Roper, 543 U.S. at 568). For the third prong, courts assess whether the traditional penological goals of retribution, deterrence, incapacitation, and rehabilitation adequately justify the punishment. Id. at 71-74.

Although the test is similar under federal and state law, our State Constitution can confer greater protection than the Eighth Amendment affords. See Zuber, 227 N.J. at 438; Gerald, 113 N.J. at 76. That said, statutes are presumed constitutional. State v. A.T.C., 239 N.J. 450, 466 (2019); Whirlpool Props., Inc. v. Dir., Div. of Tax'n, 208 N.J. 141, 172 (2011). A statute "will not be declared void unless its repugnancy to the constitution is clear beyond a reasonable doubt." Gangemi v. Berry, 25 N.J. 1, 10 (1957).

A.

Since 2005, the United States Supreme Court has written extensively about juvenile sentencing. We reviewed several of the Court's decisions in Zuber and borrow freely from that discussion. 227 N.J. at 439-46. Collectively, the rulings "establish that children are constitutionally different from adults for purposes of sentencing." Miller, 567 U.S. at 471.

1.

In Roper v. Simmons, the Court banned capital punishment for juveniles under the Eighth Amendment. 543 U.S. at 578. To begin, the Court reviewed

26

"objective indicia" of a consensus among the states about sentencing juveniles to death. Id. at 564. The Court focused on the "consistency of the direction of change" rather than the number of states that had abolished the death penalty for juveniles. Id. at 566 (quoting Atkins, 536 U.S. at 315). The Court then turned to "[t]hree general differences between juveniles under 18 and adults, [which] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." Id. at 569.

First, the Court recognized that juveniles are less mature and responsible than adults. Ibid. For support, the opinion relied on scientific and social science studies as well as plain common sense. Ibid. The disparity, the Court explained, "often result[s] in impetuous and ill-considered actions and decisions." Ibid. (quoting Johnson, 509 U.S. at 367). Second, the Court emphasized the role external pressures can play. "[J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure" and "have less control . . . over their own environment." Ibid. Third, the Court noted "that the character of a juvenile is not as well formed as that of an adult," and that juveniles' "personality traits . . . are more transitory, [and] less fixed." Id. at 570.

Taken together, the differences tell us that a juvenile's "irresponsible conduct is not as morally reprehensible as" the behavior of an adult. Ibid.

(quoting Thompson v. Oklahoma, 487 U.S. 815, 835 (1988)). Because of the "signature qualities of youth," the Court explained, "the penological justifications for the death penalty apply . . . with lesser force" to juveniles. Id. at 570-71. In that context, the Court observed that "[i]t is difficult even for expert psychologists" to determine whether a juvenile's behavior reflects "transient immaturity" or "irreparable corruption." Id. at 573.

2.

The Court built on that foundation in Graham v. Florida, which barred sentences of life without parole for juveniles convicted of non-homicide offenses. 560 U.S. at 82.

As in Roper, the Court first looked to "objective indicia of national consensus." Id. at 62. Although a majority of states permitted life-without-parole sentences for juveniles at that time, "actual sentencing practices" revealed they were rarely imposed. Ibid.

The Court next underscored certain findings in Roper about the "nature of juveniles," relying in part on scientific evidence. Id. at 68. The Court once again highlighted that children's actions are "not as morally reprehensible as" adults'. Ibid. (quoting Thompson, 487 U.S. at 835). In the context of murder, the Court observed that "a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." Id. at 69.

28

Finally, as with capital punishment for juveniles, the Court concluded that none of the traditional goals of sentencing provided an "adequate justification" for a sentence of life without parole for a juvenile. Id. at 71. The Court found it was "an especially harsh punishment for a juvenile." Id. at 70.

The Court made clear that states are "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime." Id. at 75. But they may not "ma[ke] the judgment at the outset that" a youthful offender will never "be fit to reenter society." Ibid. Instead, states must "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Ibid.

3.

Miller v. Alabama extended Graham's ban on life-without-parole sentences for juveniles to homicide offenses. 567 U.S. at 465.

The Court reiterated its findings about children in Roper and Graham and emphasized that "none of what it said" about their traits and vulnerabilities "is crime-specific." Id. at 473. The Court added that the scientific evidence underlying its earlier rulings has "become even stronger." Id. at 472 n.5.

Once again, the Court explained that "children are constitutionally different from adults for purposes of sentencing" and "have diminished

29

culpability and greater prospects for reform." Id. at 471. Mandatory sentencing schemes, though, "prevent the sentencer from taking" the circumstances of youth into account. Id. at 474.

The Court also turned to another line of case law that "demand[s] individualized sentencing when imposing the death penalty." Id. at 475. Those cases require that sentencing judges "have the ability to consider the 'mitigating qualities of youth.'" Id. at 476 (quoting Johnson, 509 U.S. at 367).

With those principles in mind, the Court listed five factors that "are particularly instructive for sentencing judges." Zuber, 227 N.J. at 445.

> Mandatory life without parole for a juvenile
>
> [1] precludes consideration of his chronological age and its hallmark features -- among them, immaturity, impetuosity, and failure to appreciate risks and consequences.
>
> [2] It prevents taking into account the family and home environment that surrounds him -- and from which he cannot usually extricate himself -- no matter how brutal or dysfunctional.
>
> [3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.
>
> [4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth -- for example, his inability to deal with police officers or prosecutors

(including on a plea agreement) or his incapacity to assist his own attorneys.

[5] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

[Miller, 567 U.S. at 477-78 (citations omitted).]

Miller did not rule out the possibility of life without parole for a juvenile who commits homicide. Id. at 479-80. Instead, it requires judges "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. at 480. The Court also observed that the harsh penalty "will be uncommon" because of the "difficulty . . . of distinguishing at [an] early age between . . . 'transient immaturity[] and the rare juvenile offender whose crime reflects irreparable corruption'" at an early stage. Id. at 479-80 (quoting Roper, 543 U.S. at 573).

Four years later, in Montgomery v. Louisiana, the Court held that Miller applied retroactively. 577 U.S. 190, 208-09 (2016). In Jones v. Mississippi, the Court recently ruled that "a separate factual finding of permanent incorrigibility is not required before a" judge can sentence a juvenile to life without parole. 593 U.S. ___, 141 S. Ct. 1307, 1318-19 (2021). Three Justices, in dissent, said the decision distorted Miller and Montgomery. Id. at 1330 (Sotomayor, J., dissenting).

31

The majority opinion added that its holding did "not preclude the States from imposing additional sentencing limits in cases" in which juveniles are convicted of murder.  Id. at 1323.

B.

In State v. Zuber, this Court extended Miller to sentences that are the practical equivalent of life without parole.  227 N.J. at 429, 446-47.  Our decision relied on the State Constitution and requires judges to evaluate the Miller factors before sentencing juveniles to a lengthy term of parole ineligibility.  Id. at 429, 447.  Because the proper focus "belongs on the real-time consequences of [an] aggregate sentence," Zuber's holding applies to cases that involve a single event or multiple offenses at different times when counts of conviction might be run consecutively.  Id. at 447.

The Court in Zuber underscored one of Graham's concerns:  the inability to determine at the moment of sentencing whether a juvenile might one day be fit to reenter society.  Id. at 451.  We also noted that some "juveniles will receive lengthy sentences with substantial periods of parole ineligibility" and may well return to court decades later to challenge the constitutionality of their sentence.  Ibid.  They "might ask the court to review factors that could not be fully assessed when they were originally sentenced -- like whether they still

32

fail to appreciate risks and consequences, or whether they may be, or have been, rehabilitated." Id. at 452 (altered to plural).

We recognized that such a claim "would raise serious constitutional issues about whether sentences for crimes committed by juveniles, which carry substantial periods of parole ineligibility, must be reviewed at a later date." Ibid. We therefore "encourage[d] the Legislature to examine [the] issue" "[t]o avoid a potential constitutional challenge in the future." Ibid. We asked "the Legislature to consider enacting a scheme that provides for later review of juvenile sentences with lengthy periods of parole ineligibility." Id. at 453. Zuber did not specify how many years of parole ineligibility are the equivalent of life without parole or when juvenile offenders might be entitled to have their sentences reviewed.

Since Zuber was decided in 2017, a number of bills relating to the issue have been introduced or reintroduced in the Legislature. See A. 4372 (June 29, 2020); S. 2591 (June 22, 2020); A. 3091 (Feb. 24, 2020) (previously introduced as A. 1233 (Jan. 9, 2018) and A. 4678 (Mar. 16, 2017)); S. 428 (Jan. 9, 2018) (previously introduced as S. 3079 (Mar. 13, 2017)). None of them have been enacted. One bill passed the Assembly and is pending in the Senate. See A. 4372/S. 2591 (allowing juveniles sentenced to 30 years or more who have served at least 20 years to petition for resentencing).

33

In a related context, this Court in State in Interest of C.K. found that a provision in Megan's Law was unconstitutional as applied to juveniles. 233 N.J. at 47-48. The statutory section prevented anyone convicted or adjudicated delinquent of certain sex offenses from applying to terminate the law's lifetime registration and notification requirements. N.J.S.A. 2C:7-2(g).

As part of our analysis, we relied on mitigating principles about juveniles set forth in Roper, Graham, Miller, and Zuber. C.K., 233 N.J. at 68-70. We concluded the statute lacked a rational basis and violated the substantive due process guarantee in the State Constitution. Id. at 48, 72-73 (interpreting N.J. Const. art. I, ¶ 1). The Court did not address C.K.'s claim under the Eighth Amendment or Article I, Paragraph 12 of the State Constitution.

## V.

Other states have also addressed lengthy mandatory minimum sentences and parole bars for juvenile offenders. Thirteen states and the District of Columbia now have statutes that allow juvenile offenders to be considered for release before 30 years have passed. Some states afford juveniles a chance at parole; others grant them an opportunity to be resentenced.

A few states had legislation in effect at the time of the Supreme Court's rulings in Graham or Miller. See Cal. Penal Code § 1170(d)(2)(A)(i) (2011)

34

(juvenile offenders sentenced to life without parole may petition the court for resentencing after 15 years); Ky. Rev. Stat. Ann. § 640.040(1) (1987) (juvenile offenders eligible for parole after 25 years for capital offenses); La. Child. Code, art. 857(B) (1994) (prohibiting confinement of 14-year-old offenders convicted in adult court beyond age 31). Montana exempts juvenile offenders from mandatory sentences of life without parole and restrictions on parole eligibility. Mont. Code Ann. § 46-18-222(1) (1991).

Notably, since Graham and Miller, nine other states and the District of Columbia have enacted similar legislation. See D.C. Code § 24-403.03(a) (2017) (judicial review of sentences after 15 years for offenses committed before age 18; amended to before age 25 in 2021); Fla. Stat. § 921.1402 (2014) (judicial review of sentences imposed on juvenile offenders after 15, 20, or 25 years, depending on the length of the original sentence); 730 Ill. Comp. Stat. § 5/5-4.5-115 (2019) (for offenses committed before age 21, individuals eligible for parole after 20 years for first-degree murder and after 10 years for other offenses, with some exceptions); N.C. Gen. Stat. § 15A-1340.19A (2012) (juvenile offenders eligible for parole after 25 years for first-degree murder); N.D. Cent. Code § 12.1-32-13.1(1) (2017) (courts may reduce sentences after 20 years for juvenile offenders convicted as adults); Or. Rev. Stat. § 144.397(1)(a) (2020) (juvenile offenders eligible for parole after 15 years);

Va. Code Ann. § 53.1-165.1(E) (2020) (juvenile offenders eligible for parole after 20 years); Wash. Rev. Code § 9.94A.730(1) (2014) (juvenile offenders may petition the sentencing review board for release after 20 years); W. Va. Code § 61-11-23(b) (2014) (juvenile offenders sentenced to more than 15 years eligible for parole after 15 years); Wyo. Stat. Ann. § 6-10-301(c) (2013) (juvenile offenders sentenced to life in prison eligible for parole after 25 years); see also Cal. Penal Code § 3051(b) (2014) (parole eligibility after 15, 20, or 25 years, depending on the length of the original sentence, for offenses committed by juveniles or individuals age 25 or younger).

Other states fix longer periods of parole ineligibility for juveniles for very serious offenses. See Ark. Code Ann. § 16-93-621 (2017) (juvenile offenders eligible for parole after 30 years for capital murder, after 25 years for first-degree murder, and after 20 years for other offenses); Colo. Rev. Stat. § 17-34-102 (2016) (juvenile offenders who complete a specialized program are eligible for parole after 30 years for first-degree murder and after 25 years for other offenses); Del. Code Ann. tit. 11, § 4204A(d)(1) to (2) (2013) (juvenile offenders may petition the court for a sentence modification after 30 years for first-degree homicide and after 20 years for other offenses); Mass. Gen. Laws Ch. 279, § 24 (2014) (minimum term of 20 to 30 years for juvenile offenders convicted of murder depending on the nature of the offense); Nev.

36

Rev. Stat. § 213.12135 (2015) (juvenile offenders convicted of an offense that resulted in the death of one victim eligible for parole after more than 20 years, and eligible after 15 years for offenses that did not result in the death of a victim; statute does not apply to juvenile offenders convicted of offenses that resulted in the death of two or more victims); Ohio Rev. Code Ann. § 2967.132(C) (2021) (parole eligibility for juvenile offenders after 30 years for multiple non-aggravated homicides and after 18 or 25 years for other offenses).

Two State Supreme Courts have also issued rulings that ban mandatory minimum sentences for juvenile offenders. In 2014, the Iowa Supreme Court in State v. Lyle held that "sentence[s] of incarceration . . . for juvenile offenders with no opportunity for parole until a minimum period of time has been served" violate the Iowa Constitution. 854 N.W.2d 378, 380 (2014).

In that case, the 17-year-old offender, Lyle, was convicted of robbery for punching another juvenile and taking a small bag of marijuana from him. Id. at 381. Lyle was sentenced to a mandatory term of 10 years in prison with no opportunity for parole until he served 7 years. Ibid.

The Iowa Supreme Court reviewed Roper, Graham, and Miller and considered Lyle's challenge to his sentence under the State Constitution's ban on cruel and unusual punishment. Id. at 392-98. Relying on the Iowa

Constitution, the Court "conclude[d that] all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional." Id. at 400. As the Court explained,

> [m]andatory minimum sentences for juveniles are simply too punitive for what we know about juveniles. Furthermore, we do not believe this conclusion is inconsistent with the consensus of Iowans. . . . [W]e think most parents would be stunned to learn this state had a sentencing schema for juvenile offenders that required courts to imprison all youthful offenders for conduct that constituted a forcible felony without looking behind the label of the crime into the details of the particular offense and the individual circumstances of the child.

> [Id. at 400-01.]

The Lyle Court also stressed its understanding of Miller: "the heart of the constitutional infirmity with the punishment imposed in Miller was its mandatory imposition, not the length of the sentence." Id. at 401. That flaw, according to the Court, applied not only to mandatory sentences for the most serious crimes but also to mandatory sentences for less serious offenses that resulted in a shorter minimum period of parole ineligibility. Ibid. In essence, the Court found that Miller's reasoning applied even to short sentences that deprive a trial judge of discretion to craft "a punishment that serves the best interests of the child and of society." Id. at 402.

Three justices dissented, id. at 404, 407, and a number of state supreme courts have not followed Lyle, see, e.g., Burrell v. State, 207 A.3d 137, 144 (Del. 2019); State v. Anderson, 87 N.E.3d 1203, 1211 (Ohio 2017); State v. Taylor G., 110 A.3d 338, 349 n.8 (Conn. 2015).

In 2017, the Washington Supreme Court concluded that judges "must have absolute discretion to depart" from mandatory minimum sentences when they sentence juveniles in adult court. State v. Houston-Sconiers, 391 P.3d 409, 414 (Wash. 2017). The Court rested its decision on the Eighth Amendment.

In the case, 17-year-old Zyion Houston-Sconiers and 16-year-old Treson Roberts met up with three friends at Roberts' home on Halloween. Ibid. They drank vodka, smoked marijuana, and played basketball before they left the house. Ibid. The two teenagers then displayed a gun and robbed candy from groups of children who were trick-or-treating, and a cellphone from an adult. Id. at 414-15.

Under Washington state law, Houston-Sconiers and Roberts were automatically transferred to adult court on robbery charges and were later convicted of multiple counts. Id. at 415. Because of mandatory sentencing enhancements tied to the use of a firearm, the two were required to serve, respectively, 31 years and 26 years of "flat time" in prison -- time without the

possibility of early release.  Id. at 416.  The trial court accepted the prosecution's recommendation and imposed no jail time on the substantive offenses; mandatory firearm enhancements drove both sentences.  Ibid.

On appeal, the Washington Supreme Court held that under the Eighth Amendment and Miller in particular, "sentencing courts must have complete discretion to consider mitigating circumstances associated with . . . youth" at sentencing.  Id. at 420.  The Court therefore overruled state statutes that "bar[red] such discretion."  Ibid.

## VI.

The above principles and developments inform defendants' constitutional challenge, which we turn to now.

Both juveniles were sentenced under a statute that required them to serve a minimum of 30 years in prison with no possibility of parole.  N.J.S.A. 2C:11-3(b)(1).  We assess that scheme under the three-part test outlined above to determine if the punishment violates the State Constitution.

## A.

The test's first part asks whether "the punishment for the crime conform[s] with contemporary standards of decency."  Zuber, 227 N.J. at 438 (quoting Ramseur, 106 N.J. at 169).  Of particular concern here is whether a mandatory minimum period of 30 years in jail -- with no discretion for a judge

to assess the details of the offense or the circumstances of the juvenile --
reflects contemporary standards of decency.

Although recent federal case law involved lengthier sentences and the
imposition of the death penalty, see Miller, 567 U.S. 460; Graham, 560 U.S.
48; Roper, 543 U.S. 551, the Supreme Court's pronouncements about juveniles
resonate more broadly. As the Court has noted time and again, children are
different. They lack maturity and are more vulnerable to outside pressures
than adults. Roper, 543 U.S. at 569. They can be impetuous and fail to
appreciate risks and consequences. Miller, 567 U.S. at 477. Their character is
not as well formed as adult offenders. Roper, 543 U.S. at 570. And they are
often unable to deal with police officers and prosecutors, or to assist in their
own defense. Miller, 567 U.S. at 477-78.

Those contemporary observations apply generally to juveniles; they are
not crime-specific. Id. at 473. In essence, case law tells us what we know
from experience: the qualities of youth matter in everyday life, just as they
matter under the Constitution. See Zuber, 227 N.J. at 448.

We know as well that courts cannot determine at the outset that a
juvenile will never be fit to reenter society. Graham, 560 U.S. at 75. As noted
earlier, it is difficult even for experts to assess whether a juvenile's criminal
behavior is a sign of transient immaturity or irreparable corruption. Roper,

41

543 U.S. at 573. From a practical and moral standpoint, there is "a greater possibility . . . that a minor's character deficiencies will be reformed" than an adult's. Id. at 570. In the context of life without parole, the Supreme Court therefore observed that states "must . . . give [juveniles] some meaningful opportunity to" demonstrate their "maturity and rehabilitation" "to obtain release." Graham, 560 U.S. at 75. In other words, they must be given a chance to show they are fit to reenter society. Ibid. Juveniles sentenced under N.J.S.A. 2C:11-3(b) are not given that opportunity for at least three decades.

Legislative pronouncements also provide a clear and reliable objective source of contemporary standards. Atkins, 536 U.S. at 312. The Legislature fixed the maximum sentence in the Family Part for a juvenile found to have committed murder at 20 years. N.J.S.A. 2A:4A-44(d)(1)(a). It set the maximum in the Family Part for felony murder at 10 years. N.J.S.A. 2A:4A-44(d)(1)(b). To be sure, the penalty is higher if a juvenile is waived up and treated as an adult. But those statutes reflect the Legislature's view that a juvenile who has deliberately taken someone's life should not serve more than two decades in prison.

In addition, the Legislature recently amended the sentencing statute, which now requires judges to consider youth as a mitigating factor at the time of sentencing. N.J.S.A. 2C:44-1(b)(14) ("The defendant was under 26 years of

age at the time of the commission of the offense."). When a juvenile is sentenced to a 30-year term under N.J.S.A. 2C:11-3(b)(1), however, no consideration can be given to the person's youthful status.

The Legislature recently took other steps as well to provide added protections for juvenile offenders. For example, it amended the waiver statute to raise the minimum age for a juvenile to be waived to adult court from 14 to 15. L. 2015, c. 89, §1 (codified at N.J.S.A. 2A:4A-26.1(c)(1)). The Legislature also eliminated life-without-parole sentences for juveniles in response to Zuber. L. 2017, c. 150, §1 (codified at 2C:11-3(b)(5)). But the Legislature has not amended the sentencing range for murder under N.J.S.A. 2C:11-3(b)(1).

We also note the growing trend in other states to allow juveniles an opportunity for release before they spend three decades in jail. See Atkins, 536 U.S. at 312. As the Supreme Court noted in conducting a proportionality review in Atkins, "[i]t is not so much the number of . . . States that is significant, but the consistency of the direction of change." Id. at 315.

Today, in at least 13 states and the District of Columbia, juveniles can be paroled or resentenced before serving 30 years in prison. As discussed above in section V, most of those states passed laws that allow for lesser sentences after Graham and Miller. And two recent State Supreme Court decisions held

43

that mandatory minimum sentences for juveniles constitute cruel and unusual punishment. Lyle, 854 N.W.2d at 400; Houston-Sconiers, 391 P.3d at 420, 422.

Actual sentencing practices are also a relevant factor. Graham, 560 U.S. at 62. Since Montgomery held that Miller applies retroactively, approximately 1,300 juvenile offenders serving life without parole throughout the nation have had their sentences reduced to a median term of "25 years before parole or release eligibility." Campaign for the Fair Sent'g of Youth, Montgomery Momentum: Two Years of Progress Since Montgomery v. Louisiana 4 (2018), https://cfsy.org/wp-content/uploads/Montgomery-Anniversary-2018-Snapshot1.pdf; see also Jones, 141 S. Ct. at 1322 (noting that in Mississippi "Miller has reduced life-without-parole sentences for murderers under 18 by about 75 percent") (citing Campaign for the Fair Sent'g of Youth, Tipping Point: A Majority of States Abandon Life-Without-Parole Sentences for Children 7 (2018)).

Those sources and trends all suggest that a 30-year parole bar does not conform to contemporary standards of decency. We do not rely on Pratt's dated views about juveniles who commit crimes. The 1988 Appellate Division decision predates more recent observations about juvenile punishment by the

44

United States Supreme Court and this Court. Also, <u>Pratt</u> is not binding authority on this Court.

B.

The second component of the constitutional test asks whether "the punishment [is] grossly disproportionate to the offense." <u>Zuber</u>, 227 N.J. at 438 (quoting <u>Ramseur</u>, 106 N.J. at 169).

Murder, of course, is an egregious offense that calls for serious punishment. <u>See</u> <u>Serrone</u>, 95 N.J. at 27. But there are limits, as the Supreme Court noted when it held that a sentence of "[l]ife without parole is an especially harsh punishment for a juvenile." <u>Graham</u>, 560 U.S. at 70. A 30-year parole bar raises related concerns.

Because children lack maturity and responsibility, which can lead to "ill-considered actions," because they "are more vulnerable to negative influences and outside pressures," and because their character "is not as well formed" as an adult's, their misconduct is not as morally culpable as an adult's. <u>Roper</u>, 543 U.S. at 569-70. For those reasons, recent case law calls on judges to consider mitigating qualities of youth that reflect their diminished culpability. <u>See</u> <u>Miller</u>, 567 U.S. at 477; <u>Zuber</u>, 227 N.J. at 447. Yet neither a sentence of life without parole, as in <u>Miller</u>, nor a 30-year parole bar under the homicide statute leave room for any such analysis.

45

In the case of felony murder, "a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." Graham, 560 U.S. at 69. Under the felony-murder doctrine, a "death caused in the course of a felony [is attributed] to all participants who intended to commit the felony, regardless of whether they killed or intended to kill." Miller, 567 U.S. at 491 (Breyer, J., concurring). Yet some of the hallmark characteristics of young adults -- like rash behavior and an inability to appreciate risks and consequences, id. at 477 -- can contribute to circumstances that lead to felony murder.

As noted earlier, cases that remain in the Family Part illustrate the distinction between felony murder and purposeful murder. Juveniles adjudicated of felony murder face up to 10 years in prison; those adjudicated of purposeful and knowing murder face up to 20 years. N.J.S.A. 2A:4A-44(d)(1)(a), (b). The distinction disappears for juveniles convicted as adults, even though they are less morally culpable.

The diminished culpability of juvenile offenders suggests that the severity of a 30-year parole bar for juveniles, in many cases, may be grossly disproportionate to the underlying offense.

## C.

The final part of the constitutional test asks whether "the punishment go[es] beyond what is necessary to accomplish any legitimate penological objective." Zuber, 227 N.J. at 438 (quoting Ramseur, 106 N.J. at 169). Here as well, because of the diminished culpability of juveniles, the traditional penological justifications -- retribution, deterrence, incapacitation, and rehabilitation -- "apply . . . with lesser force than to adults." Roper, 543 U.S. at 571.

That principle applies directly to the concept of retribution. "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." Tison v. Arizona, 481 U.S. 137, 149 (1987); accord Graham, 560 U.S. at 71. As a result, "the case for retribution is not as strong with a minor" because the "culpability or blameworthiness" of a juvenile is diminished on account of "youth and immaturity." Roper, 543 U.S. at 571. Juveniles are still responsible for their actions, but their "transgression 'is not as morally reprehensible as that of an adult.'" Graham, 560 U.S. at 68 (citing Thompson, 487 U.S. at 835).

Similarly, the threat of a lengthy jail sentence is less of a deterrent for juveniles than adults. "[T]he same characteristics that render juveniles less culpable than adults suggest . . . that juveniles will be less susceptible to

47

deterrence."  Id. at 72 (omission in original) (quoting Roper, 543 U.S. at 571).

They are less likely to take possible punishment into account when making

impulsive, ill-considered decisions that stem from immaturity.  Ibid.; see also

Thompson, 487 U.S. at 837.

The core rationale for incapacitation is the need to protect the public.

Yet even experts, as noted before, cannot predict whether a juvenile's criminal

behavior "reflects unfortunate yet transient immaturity" or the "rare" situation

of a minor who is "irreparabl[y] corrupt[]."  Roper, 543 U.S. at 573.

Research reveals that most juveniles desist from crime before 30 years

have passed from the time of their offense.  Scientists refer to that as the "age-

crime curve," which shows "that more than 90% of all juvenile offenders

desist from crime by their mid-20s."  Laurence Steinberg, The Influence of

Neuroscience on U.S. Supreme Court Decisions about Adolescents' Criminal

Culpability, 14 Neuroscience 513, 516 (2013);[5] see also Terrie E. Moffitt,

---

[5]  The cited article explains that

> [i]n general, adolescents and individuals in their early
> 20s are more likely than either children or somewhat
> older adults to engage in risky behaviour; most forms
> of risk-taking follow an inverted U-shaped curve with
> age, increasing between childhood and adolescence,
> peaking in either mid- or late adolescence (the peak age
> varies depending on the specific type of risk activity)
> and declining thereafter.  Involvement in violent and

48

Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy, 100 Psych. Rev. 674, 675 (1993) ("When official rates of crime are plotted against age, the rates for both prevalence and incidence of offending appear highest during adolescence; they peak sharply at about age 17 and drop precipitously in young adulthood."). The "age-crime curve" is at odds with the notion that juveniles, as a category of offenders, must be incapacitated for several decades to protect the public.

Finally, as to rehabilitation, a child's brain matures as the child grows older, including parts of the brain involved in impulse control. Miller, 567 U.S. at 472 n.5 (citing authorities); Graham, 560 U.S. at 68 (same). And juveniles are also more capable of change than adults. Graham, 560 U.S. at 68. A mandatory period of three decades in prison does not foster that type of growth or change. Nor does it serve to rehabilitate young adults in the way the State's juvenile justice system does. See C.K., 233 N.J. 67 ("Rehabilitation and reformation of the juvenile remain a hallmark of the juvenile system . . . ."). In addition, notwithstanding rehabilitative services in jail, individuals who serve lengthy prison terms often face greater challenges reintegrating into

---

non-violent crime also follow this pattern and is referred to as the "age-crime curve."

[Steinberg, 14 Neuroscience at 515.]

49

society.  See Columbia Univ. Ctr. for Just., Aging in Prison:  Reducing Elder Incarceration and Promoting Public Safety 62 (2015).  Rehabilitation cannot justify mandatory minimum sentences of 30 years for juveniles regardless of the individual facts and circumstances of a case.

D.

In our judgment, the length of a sentence in cases like the ones on appeal is not the key constitutional issue.  We recognize that some juvenile offenders should receive and serve very lengthy sentences because of the nature of the offense and of the offender.  By itself, that outcome does not necessarily trigger a constitutional concern provided appropriate limits and safeguards are followed.  See, e.g., Graham 560 U.S. at 74 (barring sentences of life without parole for non-homicide offenses); Zuber, 227 N.J. at 429 (requiring judges to consider the Miller factors).

Instead, the constitutional concern here is twofold:  the court's lack of discretion to assess a juvenile's individual circumstances and the details of the offense before imposing a decades-long sentence with no possibility of parole; and the court's inability to review the original sentence later, when relevant information that could not be foreseen might be presented.

More specifically, trial judges cannot consider how particular juvenile offenders differ from adults in ordering a sentence of three decades in prison;

the <u>Miller</u> factors come into play only for any additional jail time imposed. Plus judges cannot fully consider certain factors relevant to youth when they first sentence a juvenile offender, and cannot review a lengthy sentence at a later date to assess whether the individual has matured or shown proof of rehabilitation.  See <u>Graham</u>, 560 U.S. at 75; <u>Zuber</u>, 227 N.J. at 451.

Against the backdrop of the United States Supreme Court's pronouncements on juvenile offenders and our prior holding in <u>Zuber</u>, the existing statutory scheme runs afoul of Article I, Paragraph 12 of the State Constitution.  It presents the very situation this Court highlighted in <u>Zuber</u>: the imposition of lengthy sentences with substantial periods of parole ineligibility on juveniles, which cannot be reviewed at a later time.  <u>Zuber</u>, 227 N.J. at 451-52.

That concern does not require us to strike the homicide statute as it applies to juveniles.  Allowing minors a later opportunity to show they have matured, to present evidence of their rehabilitation, and to try to prove they are fit to reenter society would address the problem posed.  See <u>Graham</u>, 560 U.S. at 75, 79.

To save the statute from constitutional infirmity, we therefore hold under the State Constitution that juveniles may petition the court to review their sentence after 20 years.  Precedential case law supports that approach.

51

Courts have added procedures to statutes that would otherwise be unconstitutional to "save them from infirmity." Callen v. Sherman's, Inc., 92 N.J. 114, 134 (1983) (prescribing a notice and hearing requirement that landlords must follow in most cases, before padlocking a tenant's property to collect a debt, in order to save an unconstitutional statute); see also Norman J. Singer & J.D. Shambie Singer, 2A Sutherland Statutory Construction § 45:11, at 75-79 (7th ed. 2014) ("Courts . . . may imply constitutionally requisite procedures for a statute's administration to preserve its validity.").

Courts have also implied additional provisions "to rescue statutes from being invalidated" on constitutional grounds. Callen, 92 N.J. at 134 (citing Schmoll v. Creecy, 54 N.J. 194, 202-05 (1969) (extending the ability to recover under the wrongful death statute to illegitimate children in order to comport with the equal protection clause)); State v. De Santis, 65 N.J. 462, 472-73 (1974) (noting that, because the obscenity statute did not satisfy the constitutional standard set forth in Miller v. California, 413 U.S. 15 (1973), "we now judicially salvage [the statute] by incorporating the Miller requirements" rather than nullify the law and leave a void); see also State v. Lagares, 127 N.J. 20, 31-32 (1992) (saving the repeat-offender provision of the Comprehensive Drug Reform Act by requiring that guidelines be adopted and creating an avenue for judicial review).

The same principle underlies the concept of "judicial surgery."  See Town Tobacconist v. Kimmelman, 94 N.J. 85, 104 (1983) ("When a statute's constitutionality is doubtful, a court has the power to engage in 'judicial surgery' . . . [to] restore the statute to health."); State v. Natale, 184 N.J. 458, 485 (2005) ("When necessary, courts have engaged in 'judicial surgery' to save an enactment that otherwise would be constitutionally doomed.").

We add a look-back provision here to preserve the homicide statute because we have no doubt the Legislature would want the law to survive.  See Natale, 184 N.J. at 485; Callen, 92 N.J. at 135.

Juvenile offenders sentenced under the statute may petition for a review of their sentence after having spent 20 years in jail.  At the hearing on the petition, judges are to consider the Miller factors -- including factors that could not be fully considered decades earlier, like whether the defendant still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated.  See Miller, 567 U.S. at 477-78; Zuber, 227 N.J. at 451-52.

A defendant's behavior in prison since the time of the offense would shed light on those questions.  Other factors, like the circumstances of the homicide offense, would likely remain unchanged.  Both parties may also present additional evidence relevant to sentencing.  See Zuber, 227 N.J. at 450.  In particular, the trial court should consider evidence of any rehabilitative

53

efforts since the time a defendant was last sentenced.  See State v. Randolph, 210 N.J. 330, 354-55 (2012).

As the Supreme Court acknowledged in Roper, "[a]n unacceptable likelihood exists that the" brutal nature of an offense can "overpower mitigating arguments based on youth."  543 U.S. at 573; see also Graham, 560 U.S. at 78.  Courts must therefore consider the totality of the evidence.

After evaluating all the evidence, the trial court would have discretion to affirm or reduce a defendant's original base sentence within the statutory range, and to reduce the parole bar below the statutory limit to no less than 20 years.[6]

We ask trial courts to explain and make a thorough record of their findings to ensure fairness and facilitate review.  See State v. Torres, 246 N.J. 246, 272 (2021) (requiring an "explanation for the overall fairness of a sentence"); State v. Fuentes, 217 N.J. 57, 70-74 (2014) (calling for "a qualitative analysis of the relevant sentencing factors on the record"); N.J.S.A.

---

[6]  By the time of the hearing, juvenile offenders will be 35 to 38 years old. They will have had two decades to demonstrate how they have matured or reformed their ways.  In light of the passage of time, courts will be in a position to assess those issues at the hearing and form a judgment as to whether the adult before them is or will be able to reenter society.  As a result, we do not need to discuss further Zarate's argument that, before a lengthy period of parole ineligibility can be imposed, a juvenile must be found permanently incorrigible.

2C:43-2(e) (requiring a statement of reasons on the record); R. 3:21-4(h) (same).

We look to a number of sources to fix the look-back period at 20 years. First, the Legislature chose 20 years as the maximum sentence for a juvenile adjudicated of committing a homicide. N.J.S.A. 2A:4A-44(d)(1)(a). Second, the Criminal Sentencing and Disposition Commission recommended that juveniles sentenced as adults to prison terms for 30 years or more should "be entitled to apply to the court for resentencing after serving 20 years." N.J. Crim. Sent'g & Disposition Comm'n, Annual Report 29 (Nov. 2019). The Commission included representatives of the Governor and the Legislature, the Attorney General and the Public Defender, and the Parole Board and Department of Corrections, among others. Id. at ii. The Commission's recommendation was unanimous. Id. at 3.

Although we do not rely on proposed legislation that has not been enacted, the parties point to a bill that would codify the Commission's recommendation, which was pending at the time of oral argument. See A. 4372/S. 2591 (2020). As of now, the legislation has not been enacted into law.

We would have preferred to wait for the Legislature to act, but courts cannot decline to review a serious constitutional challenge on that basis. See Trop v. Dulles, 356 U.S. 86, 104 (1958) (noting that when a statute appears to

55

conflict with the Constitution, "we have no choice but to enforce the paramount commands of the Constitution" and cannot "shirk[]" that task); see also Comm. to Recall Menendez v. Wells, 204 N.J. 79, 95-96 (2010).

The Legislature is responsible for passing laws that fix the range of punishment for different crimes. State v. Cannon, 128 N.J. 546, 559-60 (1992); State v. Hampton, 61 N.J. 250, 273 (1972). The Judiciary, in turn, has long had the authority and responsibility to determine whether laws are constitutional. See Marbury v. Madison, 5 U.S. 137 (1803). In the context of sentencing laws, courts apply longstanding principles relating to the Eighth Amendment and the State Constitution and exercise independent judgment to assess constitutional claims. See Graham, 560 U.S. at 61; Gerald, 113 N.J. at 78, 89.

We have no choice but to apply those principles now in the face of an actual, live challenge. Despite good faith arguments to the contrary, we cannot elide a question because the Legislature may act in the future. The Legislature, as a matter of policy, still has the authority to select a shorter time frame for the look-back period.

The above approach does not threaten the juvenile waiver statute. In fact, it allows for the following scenario: a juvenile can be waived to adult court, prosecuted as an adult, and be sentenced for criminal homicide beyond

the maximum term that would apply in the Family Part.[7]  Today's ruling

simply allows for a review and possible reduction of a sentence after a juvenile

offender has served two decades in prison.  That step does not put in place a

system of indeterminate sentencing.

## VII.

Defendant Comer is therefore entitled to be resentenced again.  He was

resentenced in 2018, and the trial court weighed the Miller factors at that time.

To be sure, the judge said he believed a 30-year period of parole ineligibility

was "appropriate in this case."  But in reducing Comer's sentence to 30 years

in prison without the possibility of parole, the trial court accepted that the

homicide statute called for that mandatory period of imprisonment.

Plus the 100-percent period of parole ineligibility the court imposed here

-- a term of 30 years with a 30-year parole bar -- confirms that the court relied

on N.J.S.A. 2C:11-3(b)(1).  Other relevant provisions do not impose 100-

percent bars.  See, e.g., N.J.S.A. 2C:43-6(b) (authorizing courts to "fix a

minimum term not to exceed one-half of the [base] term . . . during which the

---

[7]  A prosecutor's decision to seek to waive a juvenile to adult court -- which
the court reviews under a deferential standard and may deny "if it is clearly
convinced that the prosecutor abused his discretion" in considering certain
statutory factors, N.J.S.A. 2A:4A-26.1(c)(3) -- cannot be compared to a
judge's review and determination of the particularized Miller factors at
sentencing.  See post at ___ (slip op. at 12-13).

defendant shall not be eligible for parole"); N.J.S.A. 2C:43-7.2(a) (directing that courts in certain cases "shall fix a minimum term of 85% of the sentence imposed, during which the defendant shall not be eligible for parole").

Comer committed the offense in question in 2000 and has been in jail for more than 20 years. When he is resentenced on remand, the matter should be treated in the same way that a petition for review of a 30-year sentence with a 30-year parole bar would be addressed, after a juvenile offender had spent 20 years in jail. After assessing the relevant evidence, the trial court here has the authority to impose a period of parole ineligibility of less than 30 years, but not less than 20 years. We recognize the trial court already reduced Comer's sentence substantially in 2018 and do not express a view on the outcome of the hearing.

## VIII.

Pursuant to this opinion, defendant Zarate is also entitled to a resentencing hearing. In determining an appropriate sentence, the trial court has the authority to impose a reduced sentence consistent with the range set forth in N.J.S.A. 2C:11-3(b)(1) and the principles outlined above. Because Zarate has not been in prison for 20 years, he is not eligible for a review of his sentence via a petition for a look-back; instead, he is to be sentenced anew with an appropriate application of the Miller factors.

58

The trial court misapplied the first <u>Miller</u> factor when it resentenced

Zarate in 2017.  As noted above, that factor invites consideration of the

"hallmark features" of youth -- "among them, immaturity, impetuosity, and

failure to appreciate risks and consequences."  <u>Miller</u>, 567 U.S. at 477.  At

Zarate's most recent resentencing, the trial court, in essence, mistakenly

substituted "intelligence" for "maturity" in evaluating the factor.

The first factor reflects the fact that teenagers -- even intelligent ones --

are not yet as mature, or as fully developed in their way of thinking, as adults.

On rare occasions, the State might be able to present expert psychiatric

evidence as proof that a particular juvenile offender possessed unusual

maturity beyond his years.  If unrefuted, the first factor would not weigh in the

defendant's favor.  But a juvenile offender has no burden to produce evidence

that his brain has not fully developed in order for the first factor to be

considered in mitigation.  <u>See</u> <u>Jones</u>, 141 S. Ct. at 1315-16 (describing the

<u>Miller</u> factors as mitigating factors).

The trial court also relied on Zarate's "well-organized allocution," in

which he quoted Nietzsche at one point.  That type of comment alone does not

establish proof of maturity within the meaning of the first factor.  Nor would

improved grades or educational accomplishments <u>after</u> a juvenile's offense

59

weigh against the first factor. They may instead reflect a person's maturation or rehabilitation over time.

We note as well that strategic decisions by counsel for both sides -- like the introduction of a stipulation or a statement to the police -- cannot be attributed to a juvenile or factor into the Miller analysis, absent evidence that the juvenile controlled counsel's choice. See Miller, 567 U.S. at 477-78 (fourth factor). Nor should a client's request that counsel file certain motions or make certain objections carry much, if any, weight. Such privileged conversations would seldom come to light in any event; here, Zarate himself volunteered the information.

Zarate also renews his claim that he was a victim of peer pressure from his older brother. See id. at 477 (third factor). The trial court rejected that argument, and its decision is supported by competent credible evidence in the record. See State v. Roth, 95 N.J. 334, 364-66 (1984); see also State v. Bolvito, 217 N.J. 221, 228 (2014) (sentencing court's determinations are reviewed for abuse of discretion). We see no reason to reconsider the court's ruling.

As in Comer's case, we recognize the trial court already reduced Zarate's sentence in 2017. In doing so, the judge appropriately considered the serious nature of the offense as well as Zarate's behavior in prison and record

of infractions, among other things.[8]  We do not express a view on the outcome of the resentencing hearing.[9]

## IX.

For all of those reasons, we reverse and remand the two matters for resentencing consistent with the principles outlined above.

JUSTICES LaVECCHIA, ALBIN, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.  JUSTICE SOLOMON filed an opinion concurring in part and dissenting in part, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.

---

[8]  The State submits that Zarate was charged more recently by a complaint-summons in April 2021.

[9]  The judge who oversaw the trial and resentencing hearings is no longer serving on recall.  Zarate's request that the matter be remanded to a different judge for resentencing is therefore moot.

State of New Jersey,

Plaintiff-Respondent,

v.

James Comer, a/k/a
James B. Comer and
James F. Comer

Defendant-Appellant.

State of New Jersey,

Plaintiff-Respondent,

v.

James C. Zarate, a/k/a
Navajas Zarate,

Defendant-Appellant.

JUSTICE SOLOMON, concurring in part, dissenting in part.

The majority today holds that the New Jersey Constitution requires a 20-year lookback period for juvenile offenders who were waived to adult court and tried and convicted as adults of homicide offenses. We acknowledge our colleagues' view that the New Jersey Constitution permits our intervention here. But we are not legislators imbued by our Constitution with such

1

authority. In our view, the majority today act "as legislators" instead of as judges. Gregg v. Georgia, 428 U.S. 153, 175 (1976). Thus, we respectfully dissent.

The majority asserts that it is required to act by our Constitution and landmark juvenile sentencing cases from both this Court and the United States Supreme Court. See Miller v. Alabama, 567 U.S. 460 (2012); Graham v. Florida, 560 U.S. 48 (2010); State v. Zuber, 227 N.J. 422 (2017). The cited cases hold that, for the purpose of sentencing, the Constitution requires courts to treat juveniles differently and to consider certain factors before sentencing them to life without parole or its functional equivalent. We believe that our current sentencing scheme fulfils that constitutional mandate. Thus, it is not our prerogative to impose an additional restriction on juvenile sentencing.

In our view, a 30-year parole bar for juveniles tried as adults and convicted of homicide conforms with contemporary standards of decency, is not grossly disproportionate as to homicide offenses, and does not go beyond what is necessary to achieve legitimate penological objectives.

Accordingly, we believe that the majority's imposition of a 20-year lookback period for homicide offenses is a subjective policy decision rather than one that is constitutionally mandated. As such, it must be left to the Legislature, which could have considered all of the factors the majority has,

2

and some it has not.  Instead, the majority joins a small minority of states with lookback periods imposed by judicial fiat rather than by statute.

## I.

We agree with the majority's recitation of the facts and procedural history of the two cases consolidated in this appeal.  We thus begin by reiterating the bedrock principles that limit our role as a branch of government.

"It is a constitutional axiom that each branch of government is distinct and is the repository of the powers which are unique to it; the members or representatives of one branch cannot arrogate powers of another branch." Knight v. City of Margate, 86 N.J. 374, 388 (1981).  "[T]he taking of power is . . . prone to abuse and therefore warrants an especially careful scrutiny." Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 457 (1992).  The doctrine of separation of powers thus "contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch."  Knight, 86 N.J. at 388.  Like the other branches, we are "counseled and restrained by the constitution not to seek dominance or hegemony over the other branches."  Ibid.

"Accordingly, the exercise of the judicial power to invalidate a legislative act 'has always been exercised with extreme self-restraint, and with a deep awareness that the challenged enactment represents the considered

3

action of a body composed of popularly elected representatives.'" State v. Trump Hotels & Casino Resorts, Inc., 160 N.J. 505, 526 (1999) (quoting N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8 (1972)). Consistent with those limitations, we will not invalidate any portion of a statute "unless its repugnancy to the Constitution is clear beyond a reasonable doubt." Ibid. (quoting Harvey v. Essex Cnty. Bd. of Freeholders, 30 N.J. 381, 388 (1959)). There are times, however, when "the Court must act, even in a sense seem to encroach, in areas otherwise reserved to other Branches of government." Robinson v. Cahill, 69 N.J. 133, 154 (1975). This is not one of those times.

## II.

In this appeal, the Court considers whether a juvenile adjudicated as an adult, convicted of murder, and sentenced to a term of imprisonment of 30 years before being eligible for parole pursuant to a statute violates the ban on cruel and unusual punishment embodied in the Eighth Amendment of the United States Constitution and Article I, Paragraph 12 of the New Jersey Constitution.

The ban on excessive punishment "flows from the basic precept of justice that punishment for crime should be graduated and proportioned to the offense." Zuber, 227 N.J. at 437 (internal quotation marks omitted) (quoting Roper v. Simmons, 543 U.S. 551, 560 (2005)). "'The test to determine

4

whether a punishment is cruel and unusual . . . is generally the same' under both the Federal and State Constitutions," and the language of both is virtually identical.  Id. at 438 (omission in original) (quoting State v. Ramseur, 106 N.J. 123, 169 (1987)).  Both require a three-part inquiry:

> First, does the punishment for the crime conform with contemporary standards of decency?  Second, is the punishment grossly disproportionate to the offense?  Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?
>
> [Ibid. (quoting Ramseur, 106 N.J. at 169).]

In assessing the first prong, "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."  Graham, 560 U.S. at 62 (alteration and internal quotation marks omitted) (quoting Atkins v. Virginia, 536 U.S. 304, 312 (2002)).  Under the third prong, courts must assess whether "[a] sentence lack[s] any legitimate penological justification."  Id. at 71.  If so, such a sentence "is by its nature disproportionate to the offense."  Ibid.

However, as to the second prong, the United States Supreme Court has adopted a different analysis for proportionality in the juvenile sentencing context, adopting the categorical approach from its death penalty cases.  See id. at 61-62.  That approach first looks to "'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to

5

determine whether there is a national consensus against the sentencing practice at issue." Id. at 61 (quoting Roper, 543 U.S. at 563). Then, "guided by 'the standards elaborated by controlling precedents and by [our] own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,'" we "must determine in the exercise of [our] own independent judgment whether the punishment in question violates the Constitution." Ibid. (quoting Kennedy v. Louisiana, 554 U.S. 407, 421 (2008)). The Court again applied that approach in Miller, 567 U.S. at 479.

The approach to assessing juvenile sentences under the Eighth Amendment adopted in Graham and Miller was premised on two guiding principles. The first is "that children are constitutionally different from adults for purposes of sentencing." Miller, 567 U.S. at 471. The second is that the imposition of the "harshest possible penalty," a sentence of life without parole, precludes consideration of those constitutionally significant differences. See id. at 477-79.

We extended Miller's holding to sentences that are the "practical equivalent of life without parole" because "[t]he proper focus belongs on the amount of real time a juvenile will spend in jail and not on the formal label attached to his sentence." Zuber, 227 N.J. at 429. In Zuber, we observed "that the Constitution 'prohibit[s] States from making the judgment at the outset that

6

[a juvenile] never will be fit to reenter society.'" Id. at 451 (alterations in original) (quoting Graham, 560 U.S. at 76).  We observed that such a judgment "would raise serious constitutional issues about whether sentences for crimes committed by juveniles, which carry substantial periods of parole ineligibility, must be reviewed at a later date."  Id. at 452.

Notwithstanding this conclusion reached in Miller, however, "the requirements of the Eighth Amendment" and thus Article I, Paragraph 12 of the New Jersey Constitution "must be applied with an awareness of the limited role to be played by the courts."  Gregg, 428 U.S. at 174.  This is because "while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators."  Id. at 174-75; see also Miller, 567 U.S. at 495 (Roberts, C.J., dissenting) ("As judges we have no basis for deciding that progress toward greater decency can move only in the direction of easing sanctions on the guilty.").

III.

A.

1.

As to the first part of our inquiry -- whether a 30-year parole bar for juveniles convicted of murder conforms with contemporary standards of decency -- we observe that Graham, Miller, and their progeny all take pains to

7

specify that the constitutional infirmity lies in sentencing juveniles to such lengthy terms of parole ineligibility that they will likely never truly receive the opportunity for parole. Such a sentence "den[ies] the defendant the right to reenter the community." Graham, 560 U.S. at 74. Indeed, sentencing a teenager to six or seven decades of parole ineligibility would "mak[e] youth (and all that accompanies it) irrelevant." Miller, 567 U.S. at 479. Today, the majority holds that 20 years of parole ineligibility is the constitutional limit, taking Miller farther than its reasoning warrants and farther than Article I, Paragraph 12 of the New Jersey Constitution requires.

We joined the majority in Zuber in part because adhering to the mere label of "life" rather than the actual term of years would "elevate form over substance." Zuber, 227 N.J. at 447. Before our decision in Zuber, Comer's sentence was a minimum of 68 years and 3 months before he would be eligible for parole. Zarate's sentence was a minimum of 63 years and 9 months before he would be eligible. Comer would have been about 85 and Zarate about 77 before becoming eligible for parole. Before the Court on this appeal stands Comer, who would serve 30 years before becoming eligible for parole, and Zarate, who would serve 42 1/2 years before becoming eligible. Thus, Comer would become eligible at 47 years of age, and Zarate at 56.

Defendants' sentences were not the functional equivalent of life without parole post-Zuber. Under those sentences, there existed the possibility of rehabilitation and reentry into society for both of them. See Rummel v. Estelle, 445 U.S. 263, 280-81 (1980) (recognizing that the opportunity for "parole, however slim, serves to distinguish" a sentence from one without the possibility of parole). A minimum of 30 years before parole ineligibility is not a "denial of hope," it does not mean "that good behavior and character improvement are immaterial," and it does not mean whatever the future might hold in store for the mind and spirit of [the juvenile offender], he will remain in prison for the rest of his days." Graham, 560 U.S. at 70 (quoting Naovarath v. State, 779 P.2d 944, 944 (Nev. 1989)). Respect for the Legislature's authority under New Jersey's Constitution should have ended the discussion there.

A reviewing court's role is to ensure that a statutory scheme does not eliminate a judge's discretion by mandating a penalty that will subject a juvenile offender to such a lengthy term of years that his youth is irrelevant. That was not the case here. "The power to declare what shall be deemed a crime and to fix the maximum and minimum term of imprisonment for such a crime is committed by the people of the State to the legislative and not to the

judicial branch of government." State v. Hampton, 61 N.J. 250, 273 (1972);

see also State v. Des Marets, 92 N.J. 62, 80-81 (1983).

2.

Although many states have imposed lookback periods for juvenile

offenders -- some that require review even earlier than the 20-year mark

imposed by the majority -- nearly all have done so through legislation. See,

e.g., W. Va. Code § 61-11-23(b) (parole eligibility after 15 years); N.D. Cent.

Code § 12.1-32-13.1 (parole eligibility or sentence reduction after 20 years).

Some have retained parole bars longer than 20 years. See Del. Code Ann. tit.

11, § 4204A(d)(1) to (2) (parole eligibility after 30 years for first-degree

homicide); Wyo. Stat. Ann. § 6-10-301(c) (parole eligibility after 25 years for

first-degree homicide); Mass. Gen. Laws Ch. 279, § 24 (parole eligibility after

30 years for first-degree murder committed "with extreme atrocity or cruelty,"

and after 25 to 30 years for first-degree murder committed with "deliberately

premeditated malice aforethought"); Ark. Code Ann. § 16-93-621 (parole

eligibility after 30 years for capital murder). Some states offer ranges

allowing for periods of parole ineligibility longer than 20 years. See Cal.

Penal Code § 3051(b) (parole eligibility for juveniles after 15, 20, or 25 years,

depending on the length of the original sentence); Fla. Stat. § 921.1402 (same).

The majority here follows only two states, whose high courts considered the deprivation of judicial discretion with respect to mandatory sentences for non-homicide crimes and eliminated the mandatory minimum periods of parole ineligibility.[1]  We repeat, neither of those courts were confronted with Zarate's depraved homicide of a teenage girl or Comer's series of four armed robberies, one of which led to the death of the victim.  See State v. Lyle, 854 N.W.2d 378, 380 (Iowa 2014) (considering a mandatory parole ineligibility period of 7 years for a conviction of robbery); State v. Houston-Sconiers, 391 P.3d 409, 414 (Wash. 2017) (considering mandatory parole ineligibility periods of 31 and 26 years for robbery convictions subject to firearm enhancements); see also State v. Shanahan, 445 P.3d 152, 160 (Idaho 2019) (declining to follow Houston-Sconiers because it did not "involve juveniles convicted of homicide"), cert. denied, 140 S. Ct. 545 (2019).  To date, no other state supreme court has followed either of those cases.

The majority also points to New Jersey's juvenile sentencing scheme in our Code of Juvenile Justice, N.J.S.A. 2A:4A-44(d)(1)(a), to suggest that the Legislature believes that a juvenile convicted of murder should not serve more

---

[1]  Both the Iowa and Washington state constitutions contain a prohibition on cruel and unusual punishments similar to our own and that of the Federal Constitution.  See Iowa Const. art. I, § 17; Wash. Const. art. I, § 14.

than 20 years.  In our view, this observation is plainly inconsistent with the way the waiver statute, N.J.S.A. 2A:4A-26.1, operates.  Taken together, these statutes indicate that the Legislature believes some juveniles convicted of murder should not serve more than 20 years in prison.  The distinction does not "disappear," as the majority suggests, when a juvenile is waived up to adult court.  The same is true of felony murder.  See N.J.S.A. 2A:4A-44(d)(1)(b).  In fact, the waiver statute explicitly requires a waiver motion before the Family Part to consider "[t]he nature and circumstances of the offense charged," N.J.S.A. 2A:4A-26.1(c)(3)(a); the "[d]egree of the juvenile's culpability," id. at (c)(3)(c); and the "[a]ge and maturity of the juvenile," id. at (c)(3)(d), before applying the waiver statute.  In purported support of its position, the majority observes that, under the existing statutory scheme, a juvenile may be waived and sentenced to more than the 20-year maximum sentence governing the Family Part.  But that reasoning ignores the legislative judgment that certain juvenile offenders are more dangerous than others, based upon the circumstances of the offense and culpability and age and maturity of the offender, and therefore should be subject to the 30-year parole bar after waiver.  Indeed, one of the hallmarks of waiver is the application of the sentencing scheme established in the Code of Criminal, rather than Juvenile, Justice.

And the recently amended waiver statute sets forth clearly the criteria for separating out those juveniles whom the Legislature intends should serve less time. Those criteria account for the Miller factors. Compare Miller, 567 U.S. at 477-78, with N.J.S.A. 2A:4A-26.1(c)(3) (allowing a court to deny a motion to waive a juvenile into adult court "if it is clearly convinced that the prosecutor abused his discretion in considering," among other factors, the "[d]egree of the juvenile's culpability," his "[a]ge and maturity," his "[d]egree of criminal sophistication," and "[e]vidence of mental health concerns, substance abuse, or emotional instability"). By thus making clear what must be considered before a juvenile can be waived, the Legislature has also spoken clearly regarding juvenile offenders who are subject to waiver, such as those who commit murder in a sufficiently heinous manner. "The public interest involved, prevention of violent crime, is most important -- some would say second to none -- and the legislative responsibility and power paramount." Des Marets, 92 N.J. at 81.

We recognize the growing legislative trend of establishing lookback periods for juvenile offenders, but we do not see how that legislative trend establishes a national standard that requires the majority's judicial remedy. The majority here denies our Legislature its prerogative to follow any of those states that allow a 25- or 30-year parole bar for first-degree murder, that

13

impose a sliding scale whose maximum goes beyond 20 years of parole ineligibility, or that allow for the imposition of more than 20 years of parole ineligibility for juveniles convicted of especially heinous offenses -- like Zarate -- or of multiple serious offenses -- like Comer.

We fail to see how contemporary standards of decency require a lower parole bar imposed by judicial fiat. Accordingly, the Legislature should be the one to decide, but the majority has done so in its place. That is a bridge too far for us. See Florio, 130 N.J. at 457.

B.

Under the second prong of the Eighth Amendment analysis -- proportionality -- it is true that Miller's pronouncements are not "crime-specific." 567 U.S. at 473. But that does not mean that the offense for which a defendant has been convicted falls out of the picture entirely. The majority acknowledges that murder is a serious offense but makes no effort to balance the gravity and depravity of murder with the mitigating qualities of youth. See ante at ___ (slip op. at 45) (citing State v. Serrone, 95 N.J. 23, 27 (1983)). The majority summarily concludes that, like a sentence of life without parole, a 30-year parole bar denies a court the chance to assess a juvenile offender's youth. We reiterate that we fail to see how a 30-year bar makes youth irrelevant and a 20-year bar does not. Simply put, a 30-year bar is constitutional because it

14

does not require imposition of a sentence of life without parole or its functional equivalent.  E.g., Ouk v. State, 847 N.W.2d 698, 701 (Minn. 2014).  Clearly, there is some level of uncertainty involved in making such judgments, but sufficiently serious crimes warrant proportionately serious punishments, even when committed by juveniles.  Accordingly, these policy decisions are for the Legislature.

Indeed, it is the Legislature's role to determine the appropriate penalties for those -- and all -- criminal offenses.  Hampton, 61 N.J. at 273.  Likewise, "[c]riminal punishment can have different goals, and choosing among them is within [the] [L]egislature's discretion."  Graham, 560 U.S. at 71.  The Constitution limits the Legislature from mandating a sentence of life without parole or its functional equivalent.  Below that, we think that both the Federal Constitution and our own defer to legislative judgment.  See Graham, 560 U.S. at 75 (noting that the States should "explore the means and mechanisms for compliance" with the Eighth Amendment).  Indeed, the majority today does what the Miller Court did not.  Miller "d[id] not categorically bar a penalty for a class of offenders or type of crime . . . .  Instead, it mandates only that a sentencer follow a certain process . . . ."  567 U.S. at 483.  We would simply have required the sentencing court to adhere to that process.

15

## C.

Considering whether legitimate penological objectives are served by the sentences imposed upon Zarate and Comer -- the third prong of the constitutional analysis -- the differences between life without parole and a minimum parole ineligibility period of 30 years are clear when viewed in the context of the policy objectives of sentencing. See State v. Taylor G., 110 A.3d 338, 346 (Conn. 2015) (observing that mandatory sentences that do not result in life without parole "do not implicate the factors deemed unacceptable in Roper, Graham and Miller when those penalties are imposed on juveniles, namely, the futility of rehabilitation and the permanent deprivation of all hope to become a productive member of society"). But retribution and deterrence -- like the gravity of homicide offenses -- are not irrelevant when sentencing juvenile offenders; nor is incapacitation.

The majority cites scientific literature that explains that most juveniles will desist from crime. They cite precedents and common sense in observing that juveniles are generally less culpable. These are considerations that the Legislature should balance -- and has. See A. 4372/S. 2591 (2020) (providing that our courts shall resentence certain juveniles convicted as adults and take into account "the role of the attendant characteristics of youth in the offense,

16

including impulsivity, risk-taking behavior, immaturity, and susceptibility to peer pressure").

When the Supreme Court concluded that the Eighth Amendment "prohibit[s] States from making the judgment at the outset that those offenders never will be fit to reenter society," ante at ___ (slip op. at 29) (quoting Graham, 560 U.S. at 76), it was addressing the "irrevocable judgment" that "den[ies] the defendant the right to reenter the community," Graham, 560 U.S. at 74; see also State in Interest of C.K., 233 N.J. 44, 75-76 (2018) (holding a lifetime registration requirement for certain juvenile sex offenders unconstitutional in part because "keeping on the sex-offender registry those juveniles who have completed their rehabilitation, not reoffended, and who can prove after a [15]-year look-back period that they are not likely to pose a societal threat").

A 30-year parole bar does not forever deny the defendant the right to reenter society. It is not an irrevocable judgment. It does not render moot all a juvenile offender's efforts to rehabilitate himself or to prove to society that he is no longer likely to pose a threat. See People v. Caballero, 282 P.3d 291, 295 (Cal. 2012) (holding a sentence of 110 years of parole ineligibility for a juvenile offender convicted of attempted murder unconstitutional because his

17

parole eligibility date "falls outside [his] natural life expectancy"). But it is the product of a complex legislative decision, one that we owe deference to.

Yet the majority decides that 30 years of parole ineligibility will not advance the goals of rehabilitation. Ante at ___ (slip op. at 49). But making that decision is not our constitutional role. See In re J.S., 223 N.J. 54, 78 (2015) ("Our role . . . [is] not to 'pass judgment on the wisdom of a law or render an opinion on whether it represents sound social policy.'") (quoting Caviglia v. Royal Tours of Am., 178 N.J. 460, 476 (2004))).

Most juvenile offenders will desist. Some will not. Most juveniles are less culpable. Some are not. Some will be rehabilitated faster than others, and some will never be rehabilitated. The Legislature must consider all offenders and all offenses when it enacts a statute, as well as the requirement to treat victims of crimes "with fairness, compassion and respect." N.J. Const. art. I, ¶ 22. As difficult as it is for judges to impose sentences of incarceration, it is even more difficult to decide what penal laws will govern an entire society, and "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." State v. A.T.C., 239 N.J. 450, 466 (2019) (quoting State v. Buckner, 223 N.J. 1, 14 (2015)).

## IV.

As for <u>Zarate</u>, we join in the portion of the majority's decision concluding that the sentencing court misapplied the first <u>Miller</u> factor and remanding for resentencing. We agree that in Zarate's case there must be a more substantial showing that less weight should be given to his immaturity, one of the "hallmark features" of youth. <u>Miller</u>, 567 N.J. at 477. We also agree with the majority that competent credible evidence supported the trial court's rejection of Zarate's renewed argument that he was the victim of his older brother's peer pressure. <u>See</u> <u>ante</u> at ___ (slip op. at 59-60). Beyond those points of concurrence, we respectfully dissent.

We dissent in full as to <u>Comer</u>. In that case, we would affirm Comer's sentence and do nothing more.

19